## HAMMOND *v.* CLARK.

1. In the absence of some other exclusive method of determination provided by the constitution, whether an amendment has been properly proposed and adopted according to the requirements of the existing constitution, and has become a part of the fundamental law of the State, is generally a judicial question.

2. Where an act of the legislature proposing an amendment to the constitution of the State directed the Governor to publish such proposition and submit it for ratification at the next general election, the fact that after the election he published a proclamation declaring that the amendment had been ratified was not conclusive on the courts.

3. The requirement of article 13, section 1, paragraph 1, of the constitution, that the proposed amendment shall be published in one or more newspapers in each congressional district for two months previous to the time of holding the next general election, was complied with, as to the publication in a particular newspaper, where the amendment was published once a week for nine weeks, the first publication being on August 5, and the last being on September 30, preceding the general election which was held on October 5.

4. Where an amendment to the constitution has been proposed by the legislature in the manner provided by that instrument, and it has been submitted to the voters for ratification at the prescribed time, and in substantially the prescribed manner, and has been ratified by them, such amendment will not be declared void, even if it should appear that an executive or ministerial officer did not comply strictly with the law as to the extent of publication in a particular newspaper.

5. Where the legislature by an act proposed an amendment to the constitution and directed the Governor to make the required publication and to submit the question of ratification to the voters at the next general election, and set forth the form of ballot to be used in voting for the amendment or against it, the publication by the Governor of a proclamation setting forth the entire act and declaring that the proposed amendment was submitted for ratification or rejection to the qualified voters of the State, at the next general election to be held on a named date, was a sufficient compliance with the constitution and the act as to the form of publication and submission.

6. The constitution does not require that the journals of the two houses of the legislature must be published and distributed before a proposed amendment can be submitted to the voters for ratification.

7. Where an act of the legislature and certain amending acts were declared unconstitutional by this court, and thereupon the legislature proposed an amendment to the constitution, curing the defect which had existed in the legislative acts, and also ratifying them as of the dates of their passage, and such amendment was ratified by the qualified voters of the State, it will not be declared void on the ground that it did not set out in substance or in terms the legislative acts sought to be validated, but only described them by copying their captions and referring to the year in which they were passed, or because such acts were not copied in extenso on the journals of the Senate and House of Representatives as part of such proposed constitutional amendment.

8. Where a constitutional amendment was submitted to the qualified voters of the State for ratification or rejection, the fact that in one county the printed ballots contained only a form of vote for ratification, and no form for voting against it, will not alone cause the amendment, after ratification, to be declared void.

( *a* ) This is especially true where it was not made to appear that any official was concerned in the preparation of such printed form of ballot, or that this had any substantial effect upon the general result of the election.

9. The legislature sought to increase the salaries of judges of the superior courts in certain circuits containing the largest cities in the State, and to have the difference between what was paid to judges from the State treasury and the amount so fixed paid from the treasuries of the respective counties in which such cities were located. The acts making such provision were declared by this court to be in violation of the constitution. An amendment to the constitution was proposed by the legislature, and ratified by the people, which changed the constitution as to the salaries of such judges for the future and also ratified the acts of the legislature as of their respective dates. *Held*, that such amendment will not be declared void on the ground that, in effect, it constituted two amendments, and its submission as one was violative of article 13, section 1, paragraph 1, of the constitution, which provides that "When more than one amendment is submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment separately."

10. If an amendment to the constitution has been proposed by the legislature, duly submitted to the voters of the State for ratification or rejection, and by them has been ratified, so that the amendment has become an integral part of the constitution, it can not be declared void on the ground that in some particular it does not accord with some other provision of the same instrument.

( *a* ) The different provisions of the constitution should be harmonized if practicable. If an amendment duly adopted necessarily conflicts with some previous provision, the amendment, being the last expression of the sovereign will of the people, will prevail as an implied modification *pro tanto* of the former provision.

11. An amendment to the constitution of the character indicated in the ninth headnote will not, at the instance of a county affected by it, or of the treasurer of such county, be declared void as being in conflict with the provision of the fourteenth amendment of the constitution of the United States, that no State shall deprive any person of property without due process of law, or deny to any person within its jurisdiction the equal protection of the laws.

12. Where the legislature undertook to make an increase in the salaries of judges in certain circuits, and to have the increase paid by the counties therein containing cities of not less than a certain population, and such acts were declared by this court to be invalid because violative of a provision of the constitution of the State, an amendment to the constitution thereafter duly made, which changed the constitutional provision on that subject so as to fix the rule in regard to such salaries for the future, and which ratified the legislative acts as of their respective dates, can not be declared void at the instance of one of the counties concerned, or its treasurer, on the ground that it sought to overrule the former decision, invaded the province of the judiciary, and deprived the county of its property without due process of law.

13. Where, under the acts of the legislature authorizing payment of a part of the salary of the judge of the superior court in certain counties, a judge was paid by warrants drawn by the county commissioner of one of such counties directing the county treasurer to pay to the order of the judge the amount thereof, "subject to any claim of the county," and such warrants were endorsed in collecting them, this did not amount to a contract on the part of the judge to pay back to the county such salary as was paid to him, in case the act of the legislature under which it was paid should at some future time be declared unconstitutional by the courts.

14. An amendment to the constitution of the State, which ratified the acts of the legislature under which such payments were made, was not violative of the provision of the constitution of the United States which prohibits the passage of laws impairing the obligation of contracts.

15. Such an amendment to the State constitution as that indicated in the preceding headnotes was not violative of the clause of the constitution of the United States which guarantees to every State a republican form of government.

16. In *Clark* v. *Hammond*, 134 *Ga.* 792 (68 S. E. 600), this court held that the effort by legislative enactments to supplement the salaries of judges of the superior courts in certain circuits, by requiring the payment of the increase over that payable from the State treasury to be paid by certain counties in the circuit containing cities having not less than a certain population, was in violation of the constitution as it then stood. This provision for payment was an essential part of the legislative scheme expressed in the acts under consideration. It could not be stricken from them, and leave the acts as fixing an increased salary for the judges described, payable from the State treasury; and no such construction was given to those acts by this court.

MAY 11, 1911.

Mandamus. Before Judge Meadow. Richmond superior court. January 16, 1911.

By article 6, section 13, paragraph 1, of the constitution, it was provided that the judges of the superior courts should have salaries not to exceed $2,000 per annum; and by paragraph 2 it was provided that the General Assembly might at any time, by a two-thirds vote of each branch, prescribe another and a different salary for them. By the act of August 15, 1904 (Acts 1904, p. 72), the salary of the judges of the superior courts was fixed at $3,000 per annum. By the act of August 6, 1904 (Acts 1904, p. 73), as amended by the act of August 15, 1905 (Acts 1905, p. 90), and by the act of July 31, 1906 (Acts 1906, p. 56), the legislature provided that the judges of the superior courts of all judicial circuits which were or might thereafter be established, having therein a city with a population of not less than 34,000 inhabitants according to the United States census of 1900, should receive a salary of $5,000 per annum, "the difference in amount between the sum paid said judges out of the treasury of the State and said $5,000 to be paid out of the treasury of the counties in which said cities are located."

In *Clark* v. *Hammond,* 134 *Ga.* 792, it was held that the effort in these acts to supplement the salaries of the judges of the superior courts from county treasuries was unconstitutional and void. Thereupon, by an act, passed by the requisite two-thirds majority, and approved by the Governor on August 3, 1910 (Acts 1910, p. 43), an amendment to the constitution was proposed, which was submitted to popular vote at the general election held on October 5 thereafter, and, upon receiving the requisite vote, was proclaimed by the Governor to have been adopted. After this Judge Hammond, of the Augusta circuit, which contains a city having more than 34,000 inhabitants according to the census of 1900, demanded of the county treasurer payment of the difference between $3,000 per annum paid to the superior court judges from the State treasury and $5,000 per annum. Some of the amount thus demanded accrued prior to the proclamation of the adoption of the constitutional amendment, and some thereafter. The demand was refused. He then applied for a writ of mandamus against the treasurer. An order nisi was issued. The respondent set up,

in substance, the following reasons why the writ should not be granted:

(1) That before this amendment had been adopted, Judge Hammond had sought a mandamus to compel the payment of his salary under the act whereby the legislature sought to provide it, and that the judgment holding that provision of the act invalid, and that he was not entitled thereunder, was a judgment which concluded him, and was an estoppel.

(2) That the amendment had not been duly adopted by the people, because in substance it was not a single amendment, but more than one, and was submitted as one.

(3) Because it could not be advertised until first published in the journals of the General Assembly after its adjournment, and that the legislature adjourned less than 60 days before the October election, and the journals were not published until after the election.

(4) That the publication was not for two months before the election, as required by the constitution.

(5) That the act was not separately submitted to the electorate for ratification or rejection after publication, or otherwise than by such publication, which itself contained the submission.

(6) It was claimed that the ballots in Richmond County were only printed with the form for ratification. (It was not claimed this was the act of any official.)

(7) It was claimed that the part of the amendment prescribing the salaries, and that validating the previous legislative acts on the same subject, contradict and cancel each other, and therefore render the amendment of no effect.

(8) Because the plaintiff's salary, payable from the State treasury, is already $5,000, and therefore no demand exists on the county treasury.

(9) Because the amendment to the constitution is a proviso inconsistent with the constitution, and therefore void.

(10) Because the constitutional amendment of 1910 is destructive of the previous constitution, in a most vital part, by destroying equality of burden of superior-court judges' salaries, and putting a greater burden on some counties than on others. This was alleged to be in conflict with the fourteenth amendment of the

constitution of the United States, and to deprive the respondent of moneys entrusted to him, without due process of law.

(11) That Richmond county is only one of the four counties composing the Augusta circuit, while Chatham and Fulton each compose a circuit; and this amendment specially conflicts with the fourteenth amendment of the constitution of the United States as to Richmond County.

(12) Because statutes can not be validated by a constitutional amendment for such purpose.

(13) Because the amendment does not set out the text or substance of said acts, nor are they entered on the journals in connection with such amendment.

(14) Because the validation of these acts by the people by a constitutional amendment, after they were declared void as being in conflict with an existing constitutional provision, is obnoxious to the section of the State constitution providing that the several departments of government shall remain separate, and to the constitutional provision against making donations, and that against retroactive laws; and to now allow the people by constitutional amendment to confirm this legislative act would enable them to reverse a decision of this court; and to allow a recovery from this defendant would violate the 14th amendment of the constitution of the United States, and section 4 of article 4 thereof, which guarantees to every State a republican form of government.

(15) Because the amendment, so far as it ratifies payments heretofore made to the plaintiff under the acts of 1904, 1905, and 1906, impairs the obligation of the contract between him and said county. He was paid by the defendant, on warrants drawn by W. F. Eve as county commissioner, which ordered the treasurer to pay to the order of Henry C. Hammond the amount thereof on the bill that day audited, "subject to any claim of the county." These warrants were endorsed "Henry C. Hammond," and he receipted the bill. This constituted a contract between said Hammond and said county, to repay said sums, which it can enforce unless prevented by this constitutional amendment; and therefore this amendment impairs the obligation of a contract, and is void under the constitution of the United States.

On the hearing the judge to whom the application was made refused the mandamus, and the applicant excepted.

*William H. Barrett, E. H. Callaway, Joseph B. & Bryan Cumming, C. H. & R. S. Cohen, Boykin Wright, Archibald Blackshear, John M. Slaton, Luther Z. Rosser,* and *Alexander C. King,* for plaintiff in error.

*Salem Dutcher* and *W. K. Miller,* contra.

LUMPKIN, J. (After stating the foregoing facts.)

The judge of the superior court of the Augusta circuit sought by mandamus to compel the treasurer of Richmond county to pay him a part of his salary as fixed by the amendment to the constitution of 1910 to be paid from the county treasury. This was resisted on a number of grounds. Broadly stated, the questions raised may be grouped under two general heads: (1) Did the proposed amendment (Acts 1910, p. 42) become a part of the constitution? (2) If so, shall such part of the constitution be itself declared unconstitutional and void, or to have no effect?

1-4. In dealing with the first question, counsel for plaintiff in error contended that the proclamation of the Governor declaring that the amendment was adopted was conclusive, and that the courts could not inquire into the question. To this contention we can not assent. The constitution is the supreme State law. It provides how it may be amended. It makes no provision for exclusive determination by the Governor as to whether an amendment has been made in the constitutional method, and for the issuance by him of a binding proclamation to that effect. Such a proclamation may be both useful and proper, in order to inform the people whether or not a change has been made in the fundamental law, but the constitution did not make it conclusive on that subject. When the constitution was submitted for ratification as a whole, a provision was made for a proclamation of the result by the Governor. Constitution, article 13, section 2, paragraph 2 (Civil Code (1910), § 6613). But in reference to amendments, there is no such provision. Constitution, article 13, section 1, paragraph 1 (Civil Code (1910), § 6610).

In the absence of some other exclusive method of determination provided by the constitution, the weight of authority is to the effect that whether an amendment has been properly adopted according to the requirements of the existing constitution is a judicial question. The subject has been discussed at length, and with citations of many authorities, in State *v.* Powell, 77 Miss. 543 (27 So. 927);

Bott *v.* Wurts, 63 N. J. L. 289 (43 Atl. 744, 45 L. R. A. 251) ; McConaughy *v.* Secretary of State, 106 Minn. 392 (119 N. W. 408). In considering the question whether a constitutional amendment has been properly proposed and adopted, the decisions of different courts have not been uniform as to the strictness or liberality with which constitutional provisions in regard to the manner of making amendments will be applied, and how small a deviation or failure of compliance with the letter of such provisions will require the State judiciary to declare such proposed amendment not to have been lawfully adopted so as to become a part of the constitution. In the Constitutional Prohibitory Amendment Cases, 24 Kans. 700, 710, Justice Brewer, who later became a member of the Supreme Court of the United States, thus strongly set forth the position that mere immaterial omissions or errors, which work no wrong to substantial rights, should be disregarded: "The two important, vital elements in any constitutional amendment, are, the assent of two thirds of the legislature, and a majority of the popular vote. Beyond these, other provisions are mere machinery and forms. They may not be disregarded, because, by them, certainty as to the essentials is secured. But they are not themselves the essentials. Take a strong illustration: The constitution requires that the 'secretary of State shall cause the same to be published in at least one newspaper in each county of the State where a newspaper is published, for three months preceding,' etc. Suppose a unanimous vote of both houses of the legislature, and a unanimous vote of the people in favor of a constitutional amendment, but that the secretary had omitted to publish in one county in which a newspaper was published, would it not be simply an insult to common sense to hold that thereby the will of the legislature and people had been defeated? Is it within the power of the secretary, either through ignorance or design, to thwart the public decision?" In People *v.* Sours, 31 Colo. 369 et seq. (74 Pac. 167, 102 Am. St. R. 34), the same view was taken. Steele, J., said: "At the outset it should be stated that every reasonable presumption, both of law and fact, is to be indulged in favor of the validity of an amendment to the constitution when it is attacked after its ratification by the people." See also Thompson *v.* Winnett, 78 Neb. 379 (110 N. W. 1113, 10 L. R. A. (N. S.) 149) ; State *v.* Laylin, 69 Ohio St. 1 (68 N. E. 574) ; Weston *v.* Ryan, 70 Neb.

211 (97 N. W. 347). This liberal interpretation applies rather to the manner of compliance with constitutional requirements in regard to amendments than to a total omission or disregard of such a requirement. It has not generally been held that an essential requirement could be entirely omitted, nor does the present case require us to take that position. But we concur in the view that substance is more important than form, and that the will of the legislature lawfully expressed in proposing an amendment, and the will of the people expressed at the proper time and in the proper manner at the ballot-box, in ratifying such amendment, ought not to be lightly disregarded and set at naught, even if an executive or ministerial officer should not strictly comply with his duty in connection with matters of detail, regarding the publication, or the like, and which do not appear to have substantially affected the result.

The decision in *Combs v. State,* 81 *Ga.* 780 (8 S. E. 318), and that in *Woodard v. State,* 103 *Ga.* 496 (30 S. E. 522), are not controlling on the contention that the Governor's proclamation was conclusive. In each of these cases the legislature had passed a local-option law and provided a particular method for the declaration of the result. It is not necessary for us to consider how far the courts would go into the mere question of contesting the election or the number of votes cast, or whether they would go behind the consolidation by the secretary of State. No such effort is made, and it is not disputed that a majority of the votes were cast in favor of the amendment. It is also unnecessary to discuss the effect of lapse of time or acquiescence, or of the making of an amendment to the constitution effecting a radical change in the government, and continued action in reliance thereon, or how far Federal courts would investigate the manner of the adoption of amendments to State constitutions, or would deal with the situation as they found it, until the question had been passed on by the courts of the State. None of these things are here involved. Dodd on Revision and Amendment of State Constitutions, 209 et seq.

Article 13, section 1, paragraph 1, of the constitution (Civil Code (1910), § 6610) reads as follows: "Any amendment or amendments to the Constitution may be proposed in the Senate or House of Representatives; and if the same shall be agreed to by two thirds of the members elected to each of the two houses, such

proposed amendment or amendments shall be entered on their journals, with the yeas and nays taken thereon. And the General Assembly shall cause such amendment or amendments to be published in one or more newspapers in each Congressional district, for two months previous to the time of holding the next general election, and shall also provide for a submission of such proposed amendment or amendments to the people at said next general election; and if the people shall ratify such amendment or amendments by a majority of the electors qualified to vote for members of the General Assembly, voting thereon, such amendment or amendments shall become a part of this Constitution. When more than one amendment is submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment separately."

It was contended that the proposed amendment was not published for two months prior to the election, as required by this paragraph. The first publication in the Augusta Chronicle was on August 5. It was published weekly nine times, the last time being on September 30. The election took place on October 5. Under the decisions of this court as to computing months, the first publication was two months prior to the election. *English* v. *Ozburn,* *59 Ga.* 392; *Barrett & Carswell* v. *Devine,* 60 *Ga.* 632; *Western and Atlantic Railroad* v. *Carson,* 70 *Ga.* 388; *Peterson* v. *Georgia R. &c. Co.,* 97 *Ga.* 798 (25 S. E. 370). The code declares that the word "month," employed in statutes, means a calendar month. Civil Code (1910), § 5. It also provides, that, when a number of days is prescribed for the exercise of a privilege or the discharge of a duty, only the first or last day shall be counted. Id. § 4, par. 8. Under these two provisions, two modes of calculation have grown up, under the decisions. *Rusk* v. *Hill,* 117 *Ga.* 722, 728 (45 S. E. 42). But even if the rule as to days were applied, as August has thirty-one days, between the first advertisement and the election full sixty days intervened.

It could hardly have been the intention of the constitution that an amendment should be published daily for two months. When that instrument was adopted, in some congressional districts containing no large towns there was most probably no paper published every day, and it can not be supposed that the purpose was to impose an impossible condition on the making of an

amendment. Besides, a requirement of publication in a newspaper for a month or for two months has never been treated in this State as requiring a publication daily for that length of time. In some instances, where notice was required to be given a certain time in advance of action, a single notice has been considered sufficient, if given the required time in advance. But doubtless there is a closer analogy to be drawn from advertisements of sheriff's sales, citations, etc. At the time when the constitution was formulated and adopted, the act of 1876 (Acts 1876, p. 99) was in force. This provided that where the law required "citations, notices, etc., by ordinaries, clerks, sheriffs, administrators, guardians, or others," to be published in a newspaper for thirty days, it should be sufficient to publish the same once a week for four weeks, and where they were required to be published for sixty days, it would be sufficient to publish them once a week for eight weeks previous to the term or time when an order was to be granted or the sale to take place. In *Boyd* v. *McFarlin,* 58 *Ga.* 208, it was held that when a sheriff's advertisement was required to be published once a week for four weeks before the sale, twenty-eight days must elapse between the first advertisement and the sale (not the last advertisement). This has since been changed by the act of 1891 (Civil Code (1910), § 6063). These authorities are not controlling in the present case; but they serve to show that the requirement of publication of a notice for sixty days was not understood to mean every day for sixty days, at the time of the adoption of the constitution of 1877. Much less would this be understood as necessary where the requirement was that a publication be made for two months. We are of the opinion that the weekly publication which began two months prior to the election and ran for nine insertions, the last being on September 30, before the election on October 5, was a compliance with the law.

5. The constitution provides that an amendment shall be published in one or more newspapers in each congressional district for two months previous to the time of holding the next general election; and that the General Assembly "shall also provide for the submission of such proposed amendment or amendments to the people at said next general election." In this case the General Assembly directed the Governor to make the publication and submission. He published a proclamation in which was copied the

entire act proposing each amendment, including the requirement of the submission to the people at the next general election, and the form of ballot to be cast in favor of the adoption of such amendment or against it, and declared that the proposed amendment was submitted for ratification or rejection to the. qualified voters of the State at the election held on October 5, 1910. This was a sufficient compliance with the constitution and the act as to the form of publication and submission. No separate proceeding to submit the proposed amendment, aside from the publication, was necessary.

6, 7. There is no merit in the contention that the constitution requires that the journals of the two houses of the legislature must be published before such an amendment can be submitted for ratification. Nor is there any force in the contention that the amendment to the constitution was invalid because it did not set out in substance or in terms the legislative acts sought to be validated by the latter part of it, or that such acts were not entered on the journals of the Senate and House of Representatives as part of such proposed constitutional amendment. It was not claimed that due entry of the proposed amendment itself was not made.

8. It was alleged that the ballots in Richmond county were printed only with a form of vote for ratification. This may not have been a very impartial or altogether proper mode of preparing a ballot. But it was not alleged that any official was concerned in the preparation of such printed form of ballots. If there were any irregularities in connection with the election in Richmond county, it does not appear that they were such as to have affected the general result of the election throughout the State. Civil Code (1910), § 126.

9. It was contended that the proposed amendment which was submitted to the people for ratification contained several distinct propositions, and that each of these constituted in effect a separate amendment, and should have been separately submitted. The constitution provides, that, "When more than one amendment is submitted at the same time, they shall be so submitted.as to enable the electors to vote on each amendment separately." This amendment was to a single paragraph of the constitution. While the amendment included more propositions than one, they were not wholly distinct and separate, or in regard to different subject-mat-

ters, but all tended to carry out one general purpose, and dealt with a single subject-matter—the salaries of judges in certain judicial circuits. It is true that it dealt with those salaries both in the past and in the future, but that is not a sufficient basis for a court to hold that it was necessary for the legislature to have proposed two distinct amendments on that subject, instead of one. It was argued that some of the voters might have been willing to increase the salary for the future, but not to ratify its payment in the past (this court having held that the legislative provision for payment of the increase of salaries from the county treasuries was unconstitutional), and that the two things should have been separated. Had the legislature seen fit to divide the two propositions in regard to the salaries of such judges, and to have submitted them separately, we do not say that they· might not have done so. But we can not hold that they were obliged to do so. Almost every amendment to the constitution or to a legislative act involves more than a single simple proposition. Article 6, section 13, paragraph 1, of the constitution deals with the subject of salaries of Justices of the Supreme Court, judges of the superior court, the attorney-general, and solicitors-general,—four different classes of officials. Suppose that the legislature should determine to propose an amendment repealing this paragraph, or substituting another for it, or making a. change in it which would affect all of the officers mentioned, could they not do so in a single amendment, or would they be compelled to propose four different amendments, because some voters might like to make the change in regard to one of the officials but not in regard to another? Moreover, the same paragraph contains a provision that the attorney-general shall not have any fee or perquisite in cases arising after the adoption of the constitution. Here is another distinct proposition, though still bearing on the question of the compensation of one of the officers named. Could not the legislature propose an amendment repealing the entire paragraph, although some of. the voters might·like to vote separately on this proposition, dissociated from the rest of the section? If the contention of counsel for defendant in error were sustained, it would be almost impossible to change many constitutional provisions by a single amendment, and such an amendment could not be submitted as a whole, but would have to. be broken up into fragments, and submitted in disjointed propositions.

In State ex rel. Hudd *v.* Timme, 54 Wis. 318 (11 N. W. 785), in dealing with a similar question, the court said (p. 336) : "In order to constitute more than one amendment, the proposition submitted must relate to more than one subject, and have at least two distinct and separate purposes, not dependent upon or connected with each other." The purpose there, as stated, was to change from annual to biennial sessions of the legislature; and incidentally and connected with this main purpose was a proposition to change the tenure of office of members of the General Assembly from one to two years, and to change the compensation of the members. In State ex rel. Adams *v.* Herried, 10 S. D. 120 (72 N. W. 93), the proposed amendment to the constitution, by one section, changed the number of regents of the State educational institution, and, by two other sections, abolished the trustees of such institutions. These sections were submitted together as constituting one amendment. It was held, that this did not violate the constitutional requirement that amendments should be submitted in such a way that they might be voted on separately, as the single object of the amendment was to place such institutions under the control of a single board, and provisions incidental thereto would not constitute additional amendments. In People ex rel. Elder *v.* Sours, 31 Colo. 369 (74 Pac. 167, 102 Am. St. R. 34), it was held, that a constitutional requirement that each amendment should be separately submitted was not violated by a proposed amendment, on the ground that it embraced several subjects, where the amendment related to a single object; and that the subjects embraced therein, if several, did not have to be separately submitted, where they were germane to the general subject of the amendment. The amendment there involved provided for the consolidation of the city government of Denver and the county government of Arapahoe county, and contained various provisions touching the rights and duties of the new consolidated government. In State ex rel. Morris *v.* Mason, 43 La. Ann. 590 (9 So. 776), it was held that propositions auxiliary to the main purpose did not constitute such separate amendments as to require separate submission.

A leading case in which a proposed amendment was held to include within itself several distinct amendments, so that its submission as one was not in accord with the constitutional requirement that if more than one amendment were submitted at one

time they should be submitted separately, was that of State ex rel. McClurg v. Powell, 77 Miss. 543 (27 So. 927, 48 L. R. A. 652). There a single amendment to the constitution was proposed, which made elective the judges of the Supreme, circuit, and chancery courts, and provided for the nomination of judges by districts, who should be voted for by the entire State, and which repealed five existing sections of the constitution, three of them relating to the appointment of Supreme Court judges for specified terms and to the filling of vacancies, and two of them requiring the districting of the State into circuits and chancery districts, and the appointment by the Governor of such judges. It was held that the various sections of the constitution sought to be repealed by one amendment dealt with distinct and different subjects, and that the proposed amendment was in effect several amendments consolidated into one. The decision in Rea v. City of LaFayette, 130 Ga. 771 (61 S. E. 707), does not conflict with what is now held. That case arose under a proceeding to validate bonds of a municipality before their issuance. The constitution limits the power of municipal corporations to incur any new debt, and requires a submission of the question to the voters. A statute provides for such election. It was sought to authorize the issuing of an aggregate amount of bonds, for several distinct purposes, by one submission—in effect the incurring of separate debts. The distinction is clear between such an election and submitting to the voters of the State an amendment to the constitution.

The constitution provides that no law shall be passed which refers to more than one subject-matter. Constitution, article 3, section 7, paragraph 8 (Civil Code (1910), § 6437). But it has been held that this did not prevent the legislature, in connection with the general subject-matter of creating a criminal court, from fixing its jurisdiction and powers, and prescribing the authority of its judge as a judicial officer, and in connection therewith amending previous acts establishing a city court, by withdrawing criminal jurisdiction therefrom. Welborne v. State, 114 Ga. 793 (6), 820 (40 S. E. 857).

None of the grounds advanced as reasons why the constitutional amendment under consideration was not lawfully submitted and ratified, so as to become a part of the constitution, can be sustained.

10. Treating the amendment as having been constitutionally

submitted and ratified, and as having become an integral part of that instrument, we now come to consider whether it is void for any reason asserted by the defendant in error. Three errors pervade the arguments of learned counsel for defendant in error, and doubtless affected the decision of the presiding judge: First, a failure to keep in mind the difference between the power of the legislature to pass laws, subject to the constitution of the State and the limitations imposed thereby, and the power of the legislature to propose and of the people to ratify, in the prescribed method, an amendment to the constitution. Second, a failure to recognize the difference between an effort on the part of the legislature, or even of a constitutional convention, to overrule or reverse a decision of a court of competent jurisdiction, by granting a new trial or destroying rights of persons which have accrued thereunder, and the making of an amendment to the constitution, whereby the authority to pass an act in reference to a county is conferred on the legislature, or its previous action is confirmed, thus supplying the constitutional sanction because of the absence of which the previous legislative action has been declared void. And third, not discriminating between the status of an individual, or a private corporation with its rights of property as an artificial person, and a public corporation, a governmental agency to which has been entrusted the discharge of certain local governmental functions, and which is subject to legislative control except where restrained by constitutional limitations, and *a fortiori* is subject to control by the constitution of the State, unless it be in conflict with the constitution of the United States. If these three points of distinction are carefully borne in mind, they will solve most of the questions which have been raised by the defendant in error. The constitution of the State places certain limitations and restrictions upon the action of the legislature. Acts passed which conflict with the constitution are invalid. But the constitution itself may be amended in the manner provided by it; and when an amendment has been duly made, it becomes as much a part of the constitution as any other part thereof. It can hardly be asserted that one part of the constitution is unconstitutional because it is not in perfect accord with another part of the same instrument. The general rule is that constitutional provisions will be harmonized where practicable. If there is to some extent an inconsistency between a provision

in the constitution as originally adopted, and another provision which has been added by amendment, so that one or the other must yield, the subsequent provision, being the last expression of the sovereign will of the people, will prevail as an implied modification *pro tanto* rather than be declared void or of no effect because of such partial inconsistency. City of Chicago *v.* Reeves, 220 Ill. 274 (77 N. E. 237). We do not mean to decide, however, that there is such an inconsistency presented by the amendment under consideration. It would be unprofitable to treat this constitutional amendment as if it were simply an act of the legislature, and to compare it with prior existing constitutional provisions in detail.

11. The amendment was further attacked as being violative of the constitution of the United States. It was contended that it was obnoxious to the fourteenth amendment, which declares that no State shall deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. A county has been defined to be, "One of the civil divisions of a country for judicial and political purposes, created by the sovereign power of the State of its own will, without the particular solicitation, consent, or concurrent action of the people who inhabit it; a local organization, which, for the purpose of civil administration, is invested with certain functions of corporate existence." 7 Am. & Eng. Enc. Law (2d ed.), 900. In this State it is declared by the constitution that "Each county shall be a body corporate, with such powers and limitations as may be prescribed by law." Constitution, article 11, section 1, paragraph 1 (Civil Code (1910), § 6594). There are also several provisions in regard to the method of changing county lines and county sites, and of dissolving a county and merging it with contiguous counties. Except as limited by the constitution, counties are public corporations which do not stand in the position of individuals or private corporations; nor, as against the State, do they own the taxes collected by them and the public property held by them as if it were private property. The distinction between private and public corporations is well recognized in this State; and from its earliest code to that last adopted, each has contained this definition of a public corporation: "A public corporation is one having for its object the administration of a portion

of the powers of government, delegated to it for that purpose—such are municipal corporations." Civil Code (1910), § 2190. If counties were purely legislative creations, they would be entirely subject to legislative enactment. While the power of the legislature in regard to them is to some extent limited by the State constitution, they are certainly subject to that constitution. If they can have any private property at all, as distinct from public property, none is here involved. This is not the case 'of an individual who is being deprived of his liberty or his property by the public; nor is it the case of a private corporation whose property is being taken. By amendment to the constitution the people have commanded one of the counties of the State to make certain payments for public purposes; and the treasurer of the county is contesting the validity of the amendment. As he is a bonded officer, who may be liable for an unlawful payment made from public funds in his hands, we do not hold that he can not question the legality of the command. But we are calling attention to the fact that the question is substantially between the State and one of its subordinate divisions, or governmental corporations, through its official, in considering how the question should be answered.

In Commissioners of Laramie County *v.* Commissioners of Albany County, 92 U. S. 307 (23 L. ed. 552), a territorial legislature organized two new counties, and included within their limits a part of the territory of an existing county, but made no provision for apportioning debts or liabilities. It was declared, that "Unless the constitution of a State or the organic law of a territory otherwise prescribed, the legislature has the power to diminish or enlarge the area of a county, whenever the public convenience or necessity requires;" and it was accordingly held that the old county, on discharging the debts and liabilities previously incurred, had no claim on the new counties for contribution. Mr. Justice Clifford said (p. 311) : "Public duties are required of counties as well as of towns, as a part of the machinery of the State, and, in order that they may be able to perform those duties, they are vested with certain corporate powers; but their functions are wholly of a public nature, and they are at all times as much subject to the will of the legislature as incorporated towns, as appears by the best text-writers upon the subject, and the great weight of judicial authority. Institutions of the kind, whether called counties or

towns, are the auxiliaries of the State in the important business of municipal rule, and can not have the least pretension to sustain their privileges or their existence upon anything like a contract between them and the legislature of the State, because there is not and can not be any reciprocity of stipulation, and their objects and duties are utterly incompatible with everything in the nature of compact."

But it was urged that the requirement that the county of Richmond should pay a certain amount of the salary of the judge, of the circuit which included that county, over and above the salaries paid to certain other judges of the -superior court, was a deprivation of the equal protection of the law, and an unconstitutional placing of a public burden upon that county, and thus indirectly upon its taxpayers. In Davidson v. New Orleans, 96 U. S. 97 (24 L. ed. 616), an assessment of certain real estate in New Orleans for draining swamp lands of that city was resisted. The Supreme Court held that "Neither the corporate agency by which the work is done, the excessive price which the statute allows therefor, nor the relative importance of the work to the value of the lands assessed, nor the fact that the assessment is made before the work is done, nor that the assessment is unequal as regards the benefits conferred, nor that personal judgments are rendered for the amount assessed, are matters in which the State authorities are controlled by the Federal constitution." In County of Mobile v. Kimball, 102 U. S. 691 (26 L. ed. 238), an act of the General Assembly of Alabama which provided for the improvement of the Mobile harbor at the expense of·the county of Mobile was attacked. In the opinion (p. 703) Mr. Justice Field said: "Here the objection urged is that it fastens upon one. county the expense of an improvement for the benefit of the whole State. Assuming this to be so, it is not an objection which destroys its validity. When any public work is authorized, it rests with the legislature, unless restrained by constitutional provisions, to .determine in what manner the means to defray its cost shall be raised. It may apportion the burden ratably among the counties,· or other particular subdivisions of the State, or lay the greater share or the whole upon that county or portion of the State specially and immediately benefited by the expenditure." In Giozza v. Tiernan, 148 U. S. 657 (13 Sup. Ct.

721, 37 L. ed. 599), referring to the fourteenth amendment of the constitution of the United States, and its effect upon the States' police and taxing powers, Chief Justice Fuller said: "Nor, in respect of taxation, was the amendment intended to compel the State to adopt an iron rule of equality; to prevent the classification of property for taxation at different rates; or to prohibit legislation in that regard, special either in the extent to which it operates or the objects sought to be obtained by it. It is enough that there is no discrimination in favor of one as against another of the same class." See also Bell's Gap R. Co. *v.* Pennsylvania, 134 U. S. 232 (10 Sup. Ct. 533, 33 L. ed. 892). In Michigan Central R. Co. *v.* Powers, 201 U. S. 245 (26 Sup. Ct. 459, 50 L. ed. 744), it was said: "There is no general supervision by the Nation over State taxation, in regard to which the State has, generally speaking, the freedom of a sovereign both as to objects and methods."

The amendment under consideration did not declare that certain persons should pay a tax, and that others in the same class should be exempted. It did not arbitrarily place the burden of supporting the State government upon certain taxpayers or even certain counties. It classified certain judicial circuits having in them a county containing a city of not less than a certain population by the census of 1900. At the time of the adoption of the constitution there were sixteen judicial circuits in the State. It was recognized that there were certain inequalities in the business in those circuits and in the labor of the judges. An ordinance was passed which contemplated an equalization as far as practicable. Civil Code (1910), § 6616. Since then by various acts the number of circuits has been increased, and certain changes have been made in the counties included in them. But apparently no complete method of equalization has been found practicable. The Augusta circuit is composed of four counties. Of these Richmond county far exceeds in wealth and population any of the other three. Recognizing the increased business and the consequent increased need for the sitting of the superior court in that county, the legislature provided for four terms to be held there each year, while in the other counties of the circuit two terms were held. It is to be presumed that the legislature, in proposing the amendment to the constitution, and the people in ratifying it, found legitimate reason, grow-

ing out of increased population, business, need for additional sessions of court, and demands upon the time and labor of the judge, to put into one class the circuits containing the three largest cities in the State, and to give larger salaries to the judge sitting in them than in other circuits. In the Atlanta and Eastern circuits, the county containing the city constitutes the entire circuit. In the Augusta circuit, there are four counties, as mentioned above. But we can not say that recognition of the facts above mentioned and the placing upon that county of a corresponding duty of paying a greater part of the salary than each of the other counties, or not distributing this increase over the entire State, was such an arbitrary exaction, contained in an amendment to the constitution of the State itself, as could be declared to deprive the county or its treasurer of the equal protection of the laws. There is, of course, some difference between assessments for local improvements, and the payment of a part of a salary; but even the improvement of streets, roads, or harbors benefits others beside those who live in the immediate locality where the improvement is made.

It was argued, that, if such a precedent were set, a two-thirds majority in the legislature and a mere majority of the voters could impose on any county, city, or set of taxpayers the burden of sustaining the entire State government or any part of it, at their will, and thus some could make tyrannous exactions of others, to benefit themselves. We can not accede to the proposition. The difference between such a procedure and a *bona fide* classification of judicial circuits on account of population, wealth, business and requirements of sessions of the court and services of the judge, is apparent. In Grim *v.* Weissenberg School District, 57 Penn. 433 (98 Am. D. 237), Sharswood, J., said that "Perfectly equal taxation will remain an unattainable good as long as laws and government and men are imperfect." In Head Money Cases, 112 U. S. 580 (5 Sup. Ct. 247, 28 L. ed. 798), Mr. Justice Miller said: "Perfect uniformity and perfect equality of taxation,. in all the aspects in which the human mind can view it, is a baseless dream." With the wisdom or expediency of the amendment this court does not deal. The legislature and the people have passed upon that.

12. It was urged with great earnestness that this court had adjudicated that the legislative provision for payment of the additional salary of the judges from the county treasuries was uncon-

stitutional; that the amendment was an effort to override that decision; that this was not keeping the three departments of government distinct; that the judgment operated as an estoppel; and that to now allow a recovery would be violative of the fourteenth amendment of the constitution of the United States. This argument is based on an apparent misconception of what has transpired. The legislature undertook to make an increase in the salaries of judges in certain circuits and to have the increase paid by the counties therein containing cities of not less than a certain population. On account of provisions in the constitution of the State, this court held that the legislature could not supplement salaries of the judges of the superior court from county treasuries. *Clark* v. *Hammond,* 134 *Ga.* 792 (68 S. E. 600). Thereupon, not seeking to reverse such adjudication, but recognizing it, the legislature proposed and the people ratified an amendment to the constitution by which that was rendered constitutional which previously the legislature could not constitutionally do. We think it requires no argument beyond this statement to show that the contention is not well founded. Aside from the limitations in a State constitution, and tested only by the Federal constitution, such curative laws have recently been held valid by the Supreme Court of the United States in the case of West Side Belt R. Co. *v.* Pittsburgh Construction Co., 219 U. S. 92 (31 Sup. Ct. 196, 55 L. ed.).

It was argued that this amendment was retroactive and sought to confirm payments of salaries made before its passage under an unconstitutional act. The constitution of the United States prohibits the passage of an ex post facto law, or law impairing the obligation of contracts. Constitution of U. S., article 1, section 10, paragraph 1. It does not in terms prohibit retroactive legislation, though such laws may often be invalid as impairing the obligation of contracts, depriving persons of their property without due process of law, or depriving them of the equal protection of the laws. Prohibition of retroactive laws *eo nomine* is a safeguard of the State constitution against dangerous legislation. In the absence of constitutional restriction, it was held in United States *v.* Realty Co., 163 U. S. 427 (16 Sup. Ct. 1120, 41 L. ed. 215), that Congress has the power to determine whether claims on the public treasury are founded upon moral and honorable obligations, and upon principles of right and justice; and that, having decided such questions

in the affirmative, and having appropriated public money for the payment of such claims, its decision can rarely, if ever, be the subject of review by the judicial branch of the government. Mr. Justice Peckham, delivering the opinion of the court, said (p. 439) : "We are of the opinion that the parties, situated as were the plaintiffs in these actions, acquired claims upon the government of an equitable, moral, or honorary nature. Could Congress legally recognize and pay them although the act of 1890 as to its bounty provisions might be unconstitutional? It is true that in general an unconstitutional act of Congress is the same as if there were no act. That is regarding it in its purely legal aspect. Being in violation of the constitution, that instrument must govern, and no one can base any legal claim as arising out of such an act. That is a very different principle, however, from that which we think governs in this case." See also Guthrie National Bank v. Guthrie, 173 U. S. 528 (19 Sup. Ct. 513, 43 L. ed. 796) ; Thompson v. Perrine, 103 U. S. 806 (26 L. ed. 612). In Thomson v. Lee County, 3 Wall. 327 (18 L. ed. 177), it was said: "If the legislature possess the power to authorize an act to be done, it can, by a restrospective act, cure the evils which existed, because the power thus conferred has been irregularly executed." See also Board of Commissioners of Tippecanoe County v. Lucas, 93 U. S. 108 (23 L. ed. 822). In this State the legislature did not possess the power to make this classification and require this payment from the county treasuries; but the people, through the constitution, had that power originally, and by an amendment duly made could cure the defect in the legislation.

13, 14. It was also contended that this amendment impaired the obligation of a contract. Under the acts of the legislature, a number of payments for salary were made to the judge. The county commissioner by warrants on the county treasurer directed the latter to pay to the judge on his order the amounts thereof on bills audited. Each warrant contained the words, "subject to any claim of the county;" and each was endorsed in obtaining payment. This merely meant, that, if the county had a claim against the judge, it should be deducted from the amount of the warrant. It did not constitute a contract to pay back to the county such salary as was paid to him, in case the act of the legislature under which it was paid should at some future time be declared uncon-

stitutional by the courts. Such claim as the county may have had for restitution, after the act was held unconstitutional, did not rest on express contract. In Essex Public Road Board *v.* Skinkle, 140 U. S. 334 (11 Sup. Ct. 790, 35 L. ed. 446), it was held that "An executive agency, created by a statute of a State for the purpose of improving public highways, and empowered to assess the cost of its improvement upon adjoining lands, and to put up for sale and buy in for a term of years for its own use any such lands delinquent in the payment of the assessment, does not, by such a purchase, acquire a contract right in the land so bought which the State can not modify without· violating the provisions of the con-stitution of the United States. Such a transaction is matter of law and not of contract, and as such is not open to constitutional objections."

15. It was further urged that the amendment was in conflict with the provision of the Federal constitution which guarantees to every State a republican form of government. It can not be suc-cessfully claimed that the State of Georgia will cease to have a republican form of government because, by a constitutional amend-ment, certain judicial circuits were classified and a provision was made as to them in respect to the payment of the judges of the superior courts. Judge Story, in referring to the power of the States to change their constitutions or forms, said: "The only restriction imposed on them is, that they shall not exchange repub-lican for anti-republican constitutions." Story on Constitution, § 1817; Cooley on Constitutional Limitations (7th ed.), 237 et seq.

16. It was contended that the act of 1904, as amended by those of 1905 and 1906, fixed the salary of those judges of the superior courts which were dealt with by them at $5,000 each; that this court so construed such acts in *Clark* v. *Hammond,* supra; that it was held that the provision for payment from the county treas-uries was void, thus leaving the amount fixed to be paid from the treasury of the State; that when the amendment ratified those acts of the legislature, it did so with the construction which had been placed upon them by the Supreme Court; that therefore, the salaries being already fixed at $5,000 to be paid from the State treasury, there was no balance between what was to be paid by the State and $5,000 to be paid from the county treasury either in the past or in the future. This argument is ingenious but fallacious. We

can not agree to the position that the amendment did nothing because there was nothing to do. This court did not construe the acts mentioned as fixing a salary of $5,000 to be paid to the judge of the superior court of the Augusta circuit out of the State treasury. We held that the effort by legislative act to supplement the salaries of the judges of the superior court from county treasuries was unconstitutional. That feature of the act was not such an independent or detached provision as could be eliminated and leave the act to stand as fixing salaries to be paid from the State treasury. It is evident that the legislature never intended any such enactment, and such a construction would be to make an entirely different legislative scheme from that promulgated by the General Assembly. With the decision that this inherent part of the acts was void, the acts themselves were left without force. The amendment revitalized the acts, established the rule for the future, and ratified what had been done in the past.

This case was not one turning upon contested issues of fact, but was controlled by questions of law. In their solution we have not been able to concur with the trial judge. The mandamus absolute should have been granted.

*Judgment reversed. All the Justices concur.*