28983. SEARS v. STATE OF GEORGIA et al.

HALL, Justice.

At issue in this appeal is the validity of $28,000,000 in State of Georgia General Obligation Bonds to be dated April 1, 1974, of which $12,000,000 was designated to finance land and buildings for the University System of Georgia and $16,000,000 to finance public roads and bridges. In reaching this issue, we necessarily adjudicate the constitutionality of a new system of state financing through general obligation bonds, which underlies the specific bond issue involved in this case.

General obligation bonds were first authorized as a method by which the state could incur debt by the 1972 amendment to Pars. I, II, III, IV and IX of Sec. III of Art. VII of the Constitution of Georgia of 1945 (Ga. L. 1972, pp. 1523-1533, hereinafter designated the "amendment"). The amendment created the Georgia State Financing and Investment Commission, authorized the state also to issue guaranteed revenue debt, made provision for the appropriation of monies to pay the obligations, and pledged to the payment of such debt the full faith, credit and taxing power of the State of Georgia. Prior to the amendment the state had not been authorized to incur public debt for public facility needs but had proceeded under the Authority-lease-rental system developed during the 1950's under which, until 1960, the General Assembly had no duty to appropriate money to pay the obligations of the state Authorities. The amendment took

the significant step of authorizing the direct financing of state debt.

In 1973, following ratification of the amendment, the General Assembly passed the Georgia State Financing and Investment Commission Act (Ga. L. 1973, pp. 750-778) (hereinafter, the "1973 Act") which was approved by the Governor on April 13, 1973, to implement the new financing method. The amendment, in creating the Georgia State Financing and Investment Commission (hereinafter, the "commission") had designated as its seven members the Governor, the President of the Senate, the Speaker of the House of Representatives, the State Auditor, the Attorney General, the State Treasurer, and the Commissioner of Agriculture. The commission met on December 21, 1973, and adopted a resolution authorizing the sale of bonds in the amounts and for the purposes set out above. Notice of the commission's intent to issue the bonds was then given to the District Attorney of the Atlanta Judicial Circuit, who, on behalf of the State of Georgia pursuant to the provisions of Section 5 of the 1973 Act, filed in the Superior Court of Fulton County a proceeding to validate the issuance of the bonds. Notice was given to the public of a hearing, and following this notice the commission answered the complaint of the district attorney, and the Intervenor, as a citizen and taxpayer of Fulton County, filed his motion to intervene pursuant to Code Ann. § 81A-124 (a) raising the issues which are presently here for determination. Following a hearing on February 4, 1974, the Superior Court of Fulton County on April 5, 1974 passed an order denying each and every one of Intervenor's objections. It is from this order that Intervenor appeals, raising eight questions enumerated below.

1. Intervenor claims that the trial court should have granted his motion to dismiss the validation petition because the petition failed to set forth the purpose of the bonds with the particularity[1] required by the 1973 Act,

---

[1]The petition in paragraph 4 stated that "$16,000,000 will be for the purpose of financing the construction or reconstruction of public roads and bridges

and therefore failed to state a claim on which relief could be granted. Section 5c (4) (b) of the 1973 Act (Ga. L. 1973, p. 770) requires the petition to state "for what purpose or purposes [the bonds are] to be issued." Intervenor argues that the requirement of the Amendment that the state incur debt "for public purposes" (Ga. L. 1972, p. 1524) implies that the petition should state the purposes in enough detail to allow their public nature to be determined, and he supports his argument by reference to other sections of the 1973 Act in which the word "purposes" is followed by a phrase allowing the purposes to be described in general or specific terms. Ga. L. 1973, pp. 759, 766, 769. His argument is that in considering the validation petition the General Assembly deliberately omitted the phrase allowing general or specific terms and that this deliberate omission should be given effect and means that specific terms are required in the validation petition. The state argues that the omission means that a general description will suffice.

Examination of the statutory phrases urged by Intervenor does not lead to the conclusion he seeks, but rather to the opposite conclusion. The Amendment states that "general obligation debt may not be incurred until the General Assembly has enacted legislation stating the purposes, in general or specific terms. . ." Ga. L. 1972, p. 1525. The 1973 Act reiterates this language. Further, the 1973 Act requires that in an authorizing resolution the commission "Shall state each purpose of the debt it authorizes, which statement need not be more specific but shall not be more general than the purposes in or pursuant to law . . ." Id. p. 769. Thus, the interpretation urged by Intervenor would require that the validation petition state the purpose of the bonds more fully than the General Assembly and the commission are required

approved by the Department of Transportation, and $12,000,000 will be for the purpose of financing a new construction program which will consist of the acquisition of land (if needed) and the construction and equipping of buildings and facilities at various institutions under the control of the Board of Regents of the University System of Georgia."

to do. We cannot conclude that the General Assembly intended this result.

Nor can we agree with Intervenor that a specific description is required to insure the use of the bonds for public purposes only, because it is not the purpose of a validation proceeding to determine the lawfulness of the purpose for the bonds. "If the public authorities should seek to use in an unlawful manner, or for an unlawful purpose, the proceeds of the bonds thus authorized, the remedy is not by a refusal to validate the bonds for the purpose for which they were authorized." *Gracen v. Mayor &c. of Savannah,* 142 Ga. 141 (3) (82 SE 453). "Even if [a contested] purpose were an unlawful one, it would not furnish ground for refusal to validate the bonds for the lawful purposes stated in the election notice." *Lilly v. Crisp County School System,* 117 Ga. App. 868, 872 (162 SE2d 456). See *State of Ga. v. Chatham County,* 103 Ga. App. 390, 394 (119 SE2d 120).

We conclude that the requirement of the 1973 Act is merely that the validation petition state the purpose of the bonds in general terms. The language of the petition was entirely adequate, and the court below did not err in overruling Intervenor's objection on this ground.

2. Intervenor next argues that the validation petition should have been dismissed for failure to state a claim, for the reason that the amendment designated the state treasurer a member of the commission and actually the treasurer did not participate in the meeting at which the authorizing resolution was adopted, rendering the resolution and the subsequent validation proceedings void. Actually, the place of the State Treasurer on the commission was occupied by the Director of the Fiscal Division of the Department of Administrative Services (hereinafter, the "director") who, with four other members of the commission (two members being absent) voted unanimously for the adoption of the resolution at the December 21, 1973 meeting.

The keystone of Intervenor's argument is the fact that at the same election in 1972 at which the Georgia voters ratified the amendment which as one of its

provisions placed the treasurer on the commission, the voters also ratified a different constitutional amendment which eliminated the treasurer as a constitutional officer (Ga. L. 1972, p. 1545 et seq.). *Carter v. Burson,* 230 Ga. 511 (198 SE2d 151) ruled directly on the problem presented by these concurrent amendments and held that they had the effect of abolishing the office of State Treasurer. We adhere to that decision despite Intervenor's assertion that the 1973 Act, which also designated the Treasurer as a member of the Commission, was not considered by the court in *Carter v. Burson* and has, he alleges, the effect of undermining that decision by adding weight to the conclusion that it was not intended that the office of Treasurer be wholly abolished.

We rule that the office of State Treasurer has been abolished by constitutional amendment, and there was no fatal infirmity in the membership of the commission because of the absence of the treasurer.

3. As a corollary to the absence of the treasurer, Intervenor argues that the director could not validly be designated by the General Assembly to occupy the place of the treasurer on the commission and to perform the duties of the treasurer concerning public debt. With respect to his place upon the commission, we agree with Intervenor that the General Assembly in the 1973 Act was without power to place the director on the commission as it purported to do through this language: "State Treasurer" shall mean ". . . the Treasurer of the State of Georgia or such other officer designated by a valid act of the General Assembly to perform the functions of State Treasurer with respect to public debt." Ga. L. 1973, p. 752. The Director of the Fiscal Division of the Department of Administrative Services was so designated in the Executive Reorganization Act of 1972 Ga. L. 1972, pp. 1015, 1036-1038. The director may not be thus substituted on the commission because the membership of the commission is set forth in the Constitution by virtue of the 1972 Amendment, and the General Assembly may not by legislative act substitute someone to take the place of an office-holder named in the Constitution. *Morris v. Glover,* 121 Ga. 751 (49 SE 786). Therefore, though we have held above that the

treasurer is not a member of the commission, it does not follow that the legislature may substitute the director: instead, the place of the treasurer must remain vacant and the commission has only six authorized members.

But the fact that the director improperly participated in the decision to issue the authorizing resolution does not, we rule, invalidate the commission's actions. Of a total membership of six, four unchallenged commission members (all those present) voted for the resolution, and we specifically hold that the resolution was not invalidated by the erroneous participation of the director.

We must additionally confront the question of whether the legislature might validly reassign the ministerial duties of the treasurer with respect to the general obligation sinking fund. What we have written above does not control this question. The legislature has no power, as we have written, to substitute another for a state officer to whom the Constitution has given a seat on a constitutionally created decision-making body. However, with reference to the sinking fund, the same Constitution from which the office of State Treasurer has been eliminated requires that such a fund shall exist and shall be administered; yet it provides no one to perform these duties. In these circumstances the legislature may substitute another in order that the constitutional duties may be performed, as the following discussion illustrates.

The 1972 amendment (Ga. L. 1972, p. 1526) set up a "State of Georgia General Obligation Debt Sinking Fund" as a special trust fund to pay the annual debt service, and provided that the fund should be administered by the State Treasurer as to whom sovereign immunity was waived in the event of suit by a bondholder. Similar duties were placed upon the state treasurer with respect to guaranteed revenue debt. The question is whether the General Assembly had the power to transfer those obligations to the director and whether it has transferred them as it attempted to do in the Executive Reorganization Act of 1972 and in the 1973 Act giving to the "treasurer," as redefined, duties with respect to the bond sinking fund.

Intervenor argues first that the transfer has not

been made because the Executive Reorganization Act, in attempting to transfer to the director the duties of the treasurer with respect to debt, excepted the duties of the treasurer "provided in Article VII, Section III, Paragraph IX of the Constitution relating to the State Sinking Fund," and did not transfer those, (Ga. L. 1972 p. 1038), thus leaving them as constitutionally established duties of the treasurer. Intervenor's argument fails because his assumption that the sinking fund excepted is the sinking fund for the general obligation bonds is incorrect: the sinking fund excepted is that of Art. VII, Sec. III, Par. IX referring to the State Sinking Fund (Code Ann. § 2-5609); the general obligation sinking fund which concerns us here is set up in Art. VII, Sec. III, Par. I (Code Ann. § 2-5601), and though this sinking fund was not in existence at the time of the 1972 Executive Reorganization Act, that Act contains no bar to transfer of those duties. The next inquiry must be whether the legislature had the power to transfer these duties.

When the voters of the state ratified the amendment abolishing the constitutional office of treasurer and striking from the Constitution all references to the treasurer with respect to maintaining the sinking fund, they must be held to have acquiesced in some form of reassignment of the duties of the treasurer. Had the Constitution provided for this reassignment, its mandate would prevail. However, the General Assembly has the power to make such law as it wishes on any subject it wishes, restrained only by our State and Federal Constitutions, and in the absence of any constitutional provision touching this point the General Assembly could validly reassign these duties of the State Treasurer to the director.

The inherent powers of our State General Assembly are awesome. Unlike the United States Congress, which has only delegated powers, Cooley, General Principles of Constitutional Law, 91-94 (Boston, 1880), typically the state legislatures are given by the people the full lawmaking powers; "The legislative department is not made a special agency for the exercise of specifically defined legislative powers, but is intrusted [sic] with the

general authority to make laws at discretion." 1 Cooley's Constitutional Limitations, p. 175 (8th Ed. 1927). This is true of the Georgia Legislature, ". . . the legislature being within the pale of its constitutional competency, the paramount and sovereign power in the State, clothed by the people with all power except where they have made limitations." McElreath, A Treatise on the Constitution of Georgia, § 1124, p. 461 (Atlanta, 1912). The legislature is absolutely unrestricted in its power to legislate, so long as it does not undertake to enact measures prohibited by the State or Federal Constitution. *Blackmon v. Golia,* 231 Ga. 381 (202 SE2d 186); *Green v. Harper,* 177 Ga. 680 (3) (170 SE 872); *Plumb v. Christie,* 103 Ga. 686, 696 (30 SE 759); *Nicholas v. Hovenor,* 42 Ga. 514, 517. This power of the legislature is set forth in our Constitution: "The General Assembly shall have the power to make all laws consistent with this Constitution, and not repugnant to the Constitution of the United States, which they shall deem necessary and proper for the welfare of the State." Code Ann. § 2-1920.

The legislature was within its powers in assigning to the director under the 1973 Act and the 1972 Executive Reorganization Act the duties which had belonged to the State Treasurer prior to the constitutional abolishment of that office and the duties of the treasurer referred to in later Acts and constitutional amendments.

4. Intervenor argues that the 1972 amendment is unconstitutional as a violation of Art. XIII, Sec. I, Par. I of the Georgia Constitution because its provisions were not properly submitted to the voters and therefore were not legally adopted. The improper submission is said to flow from misleading and inconsistent language prescribed by the General Assembly in describing the contents of the amendments on the ballots, with the result that the language was not sufficient to identify the amendment and to show its character and purpose.

Art. XIII, Sec. I, Par. I (Code Ann. § 2-8101) (hereinafter, the "1956 amendment") states in pertinent part: "The General Assembly, in the resolution, shall state the language to be used in submitting the proposed amendment or proposal for a new Constitution." No limitations are placed by this provision on the power of

the General Assembly to draft ballot language.

It is significant, we think, that in 1962 the General Assembly expressly repealed a former law which empowered the governor to draw the language and to make it sufficient to allow the voters "to intelligently pass upon any such proposed amendment . . ." (Ga. L. 1939, p. 305, repealed by Ga. L. 1962, p. 620). Prior to 1939 the General Assembly had power over ballot language similar to that which it has now, and this court held that under such a constitutional provision the only operative limitation is the requirement that the language be adequate to enable the voters to ascertain on which amendment they are voting. *McLennan v. Aldredge,* 223 Ga. 879 (159 SE2d 682); *Goolsby v. Stephens,* 155 Ga. 529 (117 SE 439); *Cooney v. Foote,* 142 Ga. 647 (83 SE 537). This is also the only test imposed by the 1956 amendment. *Pye v. State Hwy. Dept.,* 226 Ga. 389, 396 (175 SE2d 510). This was implicitly recognized in *Carter v. Burson,* 230 Ga. 511, supra, p. 522: "The language which was printed on the ballots in this case was clearly sufficient to identify the amendment which the electorate was called upon to ratify or reject." The court in *Carter v. Burson* did further note that the language was not misleading or confusing; but that should not be read to mean that judicial review of the language used over and above the minimal test set out above is required.

It is crucial that the 1956 Amendment calls for proposed amendments to be published in their entirety in designated newspapers of general circulation prior to the election. This is the method by which the voters should inform themselves of the contents and merits of the proposed amendments.

Though we hold that the ballot language is not a proper subject for more than this minimal judicial review, we must note that to the extent to which the legislature describes proposed amendments in any way other than through the most objective and brief of terms, or perhaps by number as is done in at least one other state, it exposes itself to the temptation—yielded to here, we think—to interject its own value judgments concerning the amendments into the ballot language and thus to propagandize the voters in the very voting booth,

in denigration of the integrity of the ballot.

However, as the ballot language here in issue shows itself upon examination to be adequate to identify the amendment to be voted upon, we rule that the Constitution was not violated by its use and the amendment was not for this reason illegally adopted.

5. Intervenor's fifth objection is that the 1972 amendment was invalidly proposed to the voters because the same amendment made provisions for both general obligation debt and guaranteed revenue debt, and failed to enable the voters to vote on each separately as required by the last sentence of Art. XIII, Sec. I, Par. I of the Constitution (Code Ann. § 2-8101).[2]

Both parties here cite *Carter v. Burson,* which in the following language describes the test to be applied: "The test of whether a . . . constitutional amendment violates the multiple subject matter rule is whether all of the parts of the Act or of the constitutional amendment are germane to the accomplishment of a single objective." 230 Ga. 519. Our review of the Amendment leads to the conclusion that its single general purpose was to restructure entirely the fashion in which the state was authorized to incur public debt, and the fact that two new types of debt were authorized does not create a dual objective and require that each be the subject of a separate proposed amendment. See *Henson v. Georgia Industrial Realty Co.,* 220 Ga. 857, 862 (142 SE2d 219); *Hammond v. Clark,* 136 Ga. 313, 324 (71 SE 479). It is enough that the separate propositions of the amendment are all germane to the accomplishment of the general purpose. *Welborne v. State,* 114 Ga. 793, 820 (40 SE 857). As the discussion of *Hammond v. Clark,* supra, elaborates, the legislature is not required to break each general objective down into the smallest component elements and submit each separately to the voters for their acceptance or rejection. Were this done, "it would

---

[2] "When more than one amendment is submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment separately; but this shall not apply to a proposal for a new Constitution."

be almost impossible to change many constitutional provisions by a single amendment, and such an amendment could not be submitted as a whole, but would have to be broken up into fragments, and submitted in disjointed propositions." 136 Ga. 325. Intervenor's objection on this ground is not meritorious.

6. Intervenor's argument that the 1973 Act, being based upon an assertedly invalid amendment, is itself invalid, falls because no infirmity in the supporting amendment has appeared.

7. It is asserted that the 1973 Act is unconstitutional because it contains matter different from that in its title, thus violating Art. III, Sec. VII, Par. VIII of the Constitution (Code Ann. § 2-1908) and refers to more than one subject matter. At issue is whether the tax exemption for bondholders created by Section 8 (a) of the Act, and for contractors engaged in state work, created by Section 8 (e), constitute matter different from the Act's title. Without reciting the entire title, we note that in pertinent part it reads, "to provide for the issuance of public debt by the State; to establish the methods, procedures, and records to be used in the authorization, sale, retirement funding and refunding of public debt . . . to provide exemptions from specific laws." In *Undercofler v. Hospital Authority of Forsyth County,* 221 Ga. 501, 504 (145 SE2d 487), we wrote that "It is sufficient if the provision of the Act is germane to the subject thereof stated in the caption." We find the tax exemptions not subject to Intervenor's objection because they are fully as germane to the stated subject matter of public debt as the hospital tax exemptions in *Undercofler v. Hospital Authority* were to the stated subject matter there concerning public health. Moreover, here the title of the Act clearly gave warning of exemption from specific laws, and we cannot agree with Intervenor's oral argument that this provision is inapplicable to these tax exemptions.

Finally, under the reasoning above and in Division 5 we reject Intervenor's contention that the Act itself embraced two or more separate subjects.

8. It is argued that the 1973 Act violates Art. III, Sec. I, Par. I of the Georgia Constitution by vesting legislative

power in the commission. Passing over the many limitations, cited by the state, placed by the Act upon the power of the commission, we conclude that the short answer to this objection by Intervenor is that it is the Constitution itself which created the commission in the 1972 Amendment and we decide that the commission's powers as enumerated in the Act lie within the purview of the amendment which, after enumerating certain powers and duties, stated further that "The Commission shall have such additional responsibilities, powers and duties as shall be provided by law." Ga. L. 1972, p. 1531. On these facts, there can be no merit in Intervenor's argument that legislative power was illegally sought to be vested in the commission by the 1973 Act. Cf. *Gordon v. Green,* 228 Ga. 505 (186 SE2d 719); *Plantation Pipe Line Co. v. City of Bremen,* 227 Ga. 1 (178 SE2d 868).
*Judgment affirmed. All the Justices concur.*

ARGUED JUNE 25, 1974 — DECIDED JULY 16, 1974.

*Jones, Bird & Howell, Arthur Howell, Harold N. Hill, Jr., Jack Spalding Schroder, Jr.,* for appellant.

*Arthur K. Bolton, Attorney General, Lauren O. Buckland, Assistant Attorney General, Lewis R. Slaton, District Attorney, King & Spalding, Pope B. McIntire, Robert L. Steed, Gambrell & Mobley, John H. Mobley, II,* for appellees.