30176. STATE OF GEORGIA v. ASHMORE et al.
30177. LINES et al. v. ASHMORE et al.

UNDERCOFLER, Presiding Justice.

The court wishes to acknowledge that the factual statement and Division I of this opinion were authored by Justice Gunter.

These two appeals involve claims to the foreshore and claims to land above the foreshore (above the high water mark) as the foreshore moves back and forth, outward toward the ocean and inward toward the land. The litigation began when the State of Georgia filed a complaint against parties who were asserting ownership of the land in question. The present appellees are

successors to the earlier defending parties, and appellees assert ownership rights in the land in question in opposition to the claims of the State. By order of the trial judge the appellees were made parties in the trial court. This is Case Number 30176.

The other appeal, Number 30177 here, had its inception when Lines and others, subdivision lot owners, filed their complaint against Glynn County and its board of commissioners and also against the predecessor parties to the present appellees. As in the other case, the present appellees were made parties by order of the trial court. Lines and the other subdivision lot owners contended below that they had rights in the subject property adverse to the rights of the appellees or that Glynn County had rights in the subject property for the benefit of the public that were adverse to the rights of the appellees. The Glynn County Board of Commissioners filed responsive pleadings that disclaimed any interest in the land in controversy. Therefore, the legal contest in Number 30176 was and is between the State and the appellees, and in Number 30177 between the Lines appellants and the appellees.

The two cases were consolidated in the trial court; the State moved for summary judgment; the Lines appellants moved for summary judgment; the appellees moved to dismiss the State's complaint for failure to state a claim and, alternatively, for summary judgment with respect to the claims asserted by the State; and the appellees also moved for summary judgment with respect to the claims asserted by the Lines appellants. The trial court then entered the following judgment: After hearing oral argument and considering the written briefs of counsel, and upon consideration of the pleadings and all evidence and stipulations of record, the court finds that there is no genuine issue as to any material fact and that the Defendants Jack B. Ashmore, Jr. and R. Walter Ashmore, III, are entitled to judgment as a matter of law. The Motion for Summary Judgment by the State of Georgia is hereby denied and the Motion for Summary Judgment by the Plaintiffs Alva B. Lines, et al., is hereby denied. The motion by the defendants Jack B. Ashmore, Jr. and R. Walter Ashmore, III to dismiss the complaint of the State

of Georgia, and each count thereof, for failure to state a claim upon which relief can be granted, and for summary judgment with respect to the claims asserted by the State of Georgia, are hereby granted and judgment is hereby entered in favor of the defendants, Jack P. Ashmore, Jr. and R. Walter Ashmore, III and the motion by the defendants Jack P. Ashmore, Jr. and R. Walter Ashmore, III for summary judgment with respect to the claims asserted by the plaintiffs Alva B. Lines, et al., is hereby granted. Judgment is hereby entered in these consolidated cases in favor of the defendants Jack B. Ashmore, Jr. and R. Walter Ashmore, III.

The State and the Lines appellants have come here and contend that the judgment below was erroneous. We reverse the judgment and remand the cases to the trial court for further proceedings consistent with this opinion.

I

The Constitutional Issue

The first issue, crucial to a decision in both cases, involves the constitutionality of a 1902 statute that was ratified and confirmed in Georgia's 1945 Constitution. (Code Ann. § 2-601).

In 1902 this court held that the boundary of a landowner whose property abutted on the ocean was the "ordinary high-water mark." *Johnson v. State,* 114 Ga. 790 (40 SE 807) (1902). Following this decision the General Assembly enacted the statute now in question. Ga. L. 1902, pp. 108, 109; Code Ann. §§ 85-1307, 85-1308, and 85-1309. The title of the 1902 Act is: "Boundaries of Lands on Tide-Waters." The caption of the 1902 Act reads: "An Act to fix and prescribe the boundaries of land adjacent to or covered by or bordering on the tide-waters of this State, and to prescribe all rights of the owners of such adjacent lands within such boundaries, and to define navigable tide-waters, and for other purposes." Section 3 of the 1902 Act reads: "Be it further enacted by the authority aforesaid, That for all purposes, including among others the exclusive right to the oysters and clams (but not to include other fish) therein or thereon being, the boundaries and rights of owners of land adjacent to or covered in whole or in part by navigable tide-waters, as defined in section 2 of this Act, shall extend to low water

mark in the bed of the water; provided, however, that nothing in this Act contained shall be so construed as to authorize such an exclusive appropriation of any tide-water, navigable or unnavigable, by any person whomsoever, as to prevent the free use of the same by others for purposes of passage and for the transportation of such freights as may be capable of being carried thereover."

The constitutionality of the 1902 Act was questionable after its enactment. The State now contends that it was and is unconstitutional, and that its attempted ratification and confirmation by the 1945 Constitution was ineffective. The State contends that the attempted constitutional ratification and confirmation in 1945 of the 1902 Act, which was unconstitutional when enacted in 1902, cannot breathe life and validity into the 1902 Act. The State's argument is, in short, that zero raised to the second power is still zero.

We reject this contention of the State on the basis of this court's decision in *Hammond v. Clark,* 136 Ga. 313 (71 SE 479) (1911). In a preceding case, *Clark v. Hammond,* 134 Ga. 792 (68 SE 600) (1910), this court had held a series of statutes unconstitutional. The 1910 General Assembly proposed a constitutional amendment, later ratified by the voters, that ratified, validated, and confirmed the series of statutes that had been declared unconstitutional by this court. This court then held in the 1911 case, *Hammond v. Clark,* supra, p. 337, that: "The amendment revitalized the acts, established the rule for the future, and ratified what had been done in the past."

We therefore hold that the constitutional ratification in 1945 of the 1902 Act, which had been in effect since its enactment and had not been held to be unconstitutional, was effective. In short, the 1945 constitutional ratification immunized the 1902 Act from a later successful constitutional attack.

II

The Effect of the 1945 Constitutional Provision
Art. 1, Sec. 6, Par. 1 (Code Ann. § 2-601)

The 1945 Constitution provides: "The Act of the General Assembly approved December 16, 1902, which extends the title of ownership of lands abutting on tidal

water to low water mark is hereby ratified and confirmed."

This constitutional provision ratified an Act approved December 16, 1902. There were a number of Acts approved that day. The provision does not " . . . extends title of ownership of lands abutting on tidal water to low water mark" as might appear from a casual reading. This language was inserted to identify *which* Act approved on December 16, 1902, was being ratified. As stated in the constitutional provision, "The Act of the General Assembly approved December 16, 1902, *which* extends title . . ." This phrase is not self-executing and is neither mandatory nor directory. It is merely for the purpose of identification. Additionally, this identifying phrase contradicts the caption of the very 1902 Act it is ratifying. That caption states, "An Act to fix and prescribe the boundaries of land adjacent to or covered by or bordering on the tide-waters of this State, and to prescribe all rights of the owners of such adjacent lands within such boundaries, and to define navigable tide-waters, and for other purposes." Acts 1902, p. 108. Furthermore, this identifying phrase contradicts the body of the 1902 Act it is ratifying. The Act shows that the title of all landowners abutting tidal water was not extended to the low water mark. Section 1 of the Act vests title to the beds of *non-navigable* tidewaters to the main thread or channel of the water. We do not construe "Title to the beds." However, whatever title was granted in Section 1 of the 1902 Act extends *below the low water mark* in *non-navigable* tide-waters. It extends to the thread of the water, not to the low water mark indicated in the 1945 constitutional provision. Also Section 3 of the 1902 Act makes no mention of title, only *rights* are given to the low water mark in *navigable* waters. The 1945 constitutional provision makes no distinction between navigable and non-navigable tide-waters. The 1902 Act, both the caption and the body, makes a clear distinction between navigable and non-navigable tide-waters and grants different rights to the owners of lands adjacent thereto. The purpose of this phrase in the 1945 Constitution can only be to identify the Act being approved. To ratify the 1902 Act and to extend titles to the low water mark is

contradictory. In order to reconcile the contradictions this court need only look at the record of the 1943-1944 Constitutional Commission to determine what was intended. Those proceedings were as follows: "Mr. Gowen. Governor, I have written to each member of the Commission before I knew we were going to be called back, with reference to a provision that some people down on the Coast think should be in the Constitution. I think I made myself clear in the letters that I wrote, but the situation has been on the Coast that under an Act of 1902 the Legislature undertook to extend the ownership of property owners abutting on the tidal land in high water marks to low water marks. The purpose was to give somebody title to the oyster beds. At that time the oyster beds had been depleted, and the idea was if the private property owner owned the oyster beds they could afford to replant them and patrol them and undertake to restore the oyster industry to the State of Georgia. So far as I know this Act has not been attacked, and people have hesitated to plant oyster beds because they think the Act of 1902 infringes on the Constitutional provision preventing the granting of the property of the State; and the suggestion was made that as soon as the war is over there are a number of people who are willing to make large investments in trying to replant oysters in the State of Georgia. I had occasion to look at some statistics, and Georgia, prior to 1890, was one of the largest oyster producing States in the Union; and at the present time it is the smallest State. I talked with Dr. Creaser, who is Supervisor of Coastal Fisheries. The State takes the position they can't plant oyster beds because the title belongs to somebody else; and under another Constitutional provision the State can't improve the property, and nobody has done anything about planting oysters. In addition to bringing new industries, the planting of oysters increases fish, because the oyster is where the small fish hide from the large fish, and where you have plenty of oyster beds you have good fishing, and the suggestion has been made that at the end of Article XII of the Constitution a provision substantially such as this, be made: 'The Act of the General Assembly approved December 16, 1902, which extends the title of ownership

of land abutting on tidal water to low water mark, is hereby ratified and confirmed.' I believe if that was done it would do away with the possibility of the law being unconstitutional, and would permit people to spend thousands of dollars necessary to plant them and spend the additional amount necessary to patrol the beds until such time as the oysters got to sufficient size to harvest. At the present time the fear they have is that if the oyster beds are planted some fellow will go in and harvest them, and the Court would declare he was properly doing so because they were on public domain and he was as much entitled to them as the other man. I do want to say this; I want to be fair with the members of the Commission. At least two of the sea-food people on the coast of Georgia regularly maintain my law firm to represent them, and I don't want the Commission to think I am undertaking to earn a fee or represent these people. A great many others that I don't represent, and the ones that I do, came to me about it, other than that; but there are two firms that pay us a regular retainer, and I want to make that clear to the Commission. Mr. Culpepper. Do your people down there want this? Mr. Gowen. Yes, sir, the oyster people want it, and there is no objection from the Supervisor of Coastal Fisheries. Mr. Atkinson. Isn't that what everybody considers the law? Mr. Gowen. It has been the law for forty-two years, and people have sold property on the basis that it was the law, and nobody questioned it. Mr. Culpepper. I move its adoption. Mr. Pope. I second the motion. Judge MacIntyre. What do the others say? Mr. Gowen. There is a difference of opinion. In Virginia the Chesapeake Bay Section, all the oysters are owned by the State and leased to the people, and in South Carolina they are individually owned and in North Carolina they are individually owned. It differs with the States. It might be open to argument. If this Act of 1902 had never been passed it might be better to let the State own them all, but I don't believe the State itself would want to undertake to pay back the few people that have planted them. Judge Smith. Mr. Gowen, I want to make this suggestion, it might be a substitute motion: Might we not, rather than incorporate in this Constitution the wording as suggested by Mr. Gowen, confirm an Act of the legislature. It appears

to me it would be better merely to incorporate the language of the Act to be confirmed rather than confirm it by reference to the Act? Mr. Gowen. I have no objection to doing that. Judge Smith. It would save them in time to come to the constitutionality of the Act. I make the substitute motion that the wording of the Act be incorporated in the Constitution rather than confirming the Act by reference. Mr. Gowen. The Act is about a page. It is really too long and it gets into too much detail. The Act does contain a provision that I think is very important that it is not necessary to have in the Constitution, and that reserves the right of notification and the right to use the area when it has water in it. No question of being able to go up and down stream. Judge Smith. Does not the Act contain all the pertinent matter you want confirmed by the Constitution? Mr. Gowen. Yes, sir. Chairman Arnall. Judge Smith offers a substitute motion that the Act of December 16, 1902, in its entirety, be inserted in the Constitution. Mr. Gowen. I think it is too long. Let me ask unanimous consent to give me until the noon hour to draw something else and submit it. Mr. Culpepper. Don't what you have cover it? Mr. Gowen. It covers it. Mr. Culpepper. I move the adoption of the amendment offered by the gentleman from Glynn. Mr. Haas. I don't understand why the Act has never been questioned since 1902. Mr. Gowen. I believe most of the lawyers here would agree with you if the constitutionality had ever been questioned it would have been declared unconstitutional. It has not been questioned because nobody has done anything about it, but the way it would seem and be questioned—by plants and oyster beds, and you come and harvest my oysters and I have you arrested for trespassing on my property and taking my property, and you try to prosecute him in court; then you raise the point that you have not taken any oysters because they did not belong to me, even though I planted them, and even though for forty-two years I thought they belonged to me; and if the courts hold you have the right to get them, then everybody else has equal right. Mr. Foley. I second Mr. Culpepper's motion. Chairman Arnall. The first motion will be Judge Smith's motion that the entire Act of December 16, 1902, be incorporated in the Constitution. So many as favor Judge

Smith's motion make it known by saying 'aye'; opposed 'no.' The nos seem to have it.

"Now the question is on Mr. Culpepper's motion, seconded by Mr. Foley, that this language be inserted in the Constitution: 'The Act of the General Assembly approved December 16, 1902, which extends the title of ownership of land abutting on tidal waters to low-water marks is hereby ratified and confirmed.' Any discussion? Is there objection? The Chair hears none and it is so ordered. Records of Constitutional Commission, 1943-1944, Vol. 2, pp. 360-363."

It is clear beyond any doubt that the constitutional commission intended to ratify the 1902 Act, nothing more. As shown therein, it was proposed originally to set out the 1902 Act verbatim in the 1945 Constitution but because of its length, they chose just to ratify the 1902 Act. There was not the faintest intention of altering the 1902 Act. Any argument that the 1945 Constitution by its own terms extended the titles of landowners adjacent to tide-waters to the low water mark is completely contrary to the intention of the Constitutional Commission and is untenable.

Whatever rights the individual parties to this case may have in the foreshore must be determined under the 1902 Act.

### III
### The Effect of the 1902 Act
(Ga. L. 1902, p. 108; Code §§ 85-1307, 85-1308, 85-1309)

Prior to the 1902 Act the title and ownership of the foreshore was in the State of Georgia. This was the common law and the law in Georgia. It was stated by this court on February 3, 1902, in *Johnson v. State,* 114 Ga. 790 (40 SE 807), a case involving an indictment for illegally taking oysters from an alleged private oyster bed. The oyster bed was located in tidal waters between the high and low water marks. *Johnson* held that title to the tidal water and underlying land was vested in the State of Georgia and was *public* land. Therefore, the defendant could not be convicted of taking oysters from a *private* oyster bed which was located on public land. The decision apparently discouraged "oystermen" because many oyster beds are located between the high and low

water marks of tidal waters. Oyster beds are frequently planted and cared for at substantial cost. However, under *Johnson,* the land between the high and low water marks was public land and "oystermen" had no private rights in the oyster beds they may have located on public land. This made an investment in planting oyster beds hazardous and, it was argued, deterred the growth of the commercial oyster industry. Consequently, it is agreed by most scholars that the 1902 Act was adopted to meet the *Johnson* decision and give some rights to "oystermen" so that their beds would be protected. This is evident from the 1943-1944 Constitutional Commission's discussion surrounding the adoption of the 1945 constitutional provision ratifying the 1902 Act. There it was stated that the constitutionality of the 1902 Act was in question and that the provisions of the Act should be ratified by the Constitution. In proposing such ratification, it was stated, "The purpose [of the 1902 Act] was to give somebody *title* to the *oyster beds*. At that time the oyster beds had been depleted, and the idea was if the private property owner owned the oyster beds they could afford to replant them and patrol them and undertake to restore the oyster industry to the State of Georgia." (Emphasis supplied.)

This history is important because it has a bearing upon the proper interpretation of the intention of the 1902 Act. Primarily the purpose of the 1902 Act was to overcome this court's decision in *Johnson* and to give "oystermen" a property right in oyster beds, particularly oyster beds they had planted.

Also, the facts and the statements of this court in *Johnson* are important in ascertaining the intention of the legislature in the 1902 Act and in interpreting the meaning of the language used. In *Johnson* the defendant contended and this court concluded that the tide-water between high and low water marks and the underlying land was owned by the State. In opposition to this contention the State argued that Code § 85-1303 (then Civil Code § 3059) defining a navigable stream and Code § 85-1304 (then Civil Code § 3060) defining the adjacent owner's rights in navigable streams applied to tide-waters and the adjacent landowner's title extended to the low water mark. Code § 85-1303 defines a navigable

stream. Code § 85-1304 states, "Rights of owner of lands adjacent to navigable streams.—The rights of the owner of lands adjacent to navigable streams extend to low-water mark in the bed of the stream." Although this court in *Johnson* held these Code sections referring to *streams* did not apply to *tide-waters* it is critical to read what the court said these Code sections did provide. It is important because the 1902 Act was adopted to overcome the *Johnson* decision. In *Johnson v. State,* supra, p. 792, this court said, "From all the light before us, we think it most reasonable to suppose that the intention of the lawmaking power, as expressed in sections 3059 and 3060 of the Civil Code, [now Code §§ 85-1303 and 85-1304], was, not to change the common law with reference to the boundaries of landowners abutting on the sea or any of its inlets, *but rather to insure to riparian proprietors the right to the river-bottoms upon their lands for agriculture purposes.*" (Emphasis supplied.)

Thus, this court said that Code § 85-1304 which provides, "The *rights* of the owner of lands adjacent to *navigable streams* extend to low-water mark in the *bed of the stream*" meant, ". . . the *right* to the *river bottoms upon their lands for agriculture purposes.*" (Emphasis supplied.)

To overcome the *Johnson* decision and its holdings, the legislature adopted the 1902 Act. What did the 1902 Act do?

The legislature distinguished between the non-navigable tide-waters and navigable tide-waters. A definition stating what is navigable is set out in section 2 of the 1902 Act (Code § 85-1308). Basically it is the same definition contained in Code § 85-1303 for fresh water.

The tide-waters involved in the instant case are on the shores bordering the Atlantic Ocean. The Atlantic Ocean is a "sea." Section 2 of the 1902 Act (Code § 85-1308) declares "a sea" to be navigable tide-water provided it is used for purposes of navigation or is capable of bearing upon its *bosom* at mean low tide, boats loaded with freight in the regular course of trade. The Atlantic Ocean can bear upon its bosom freight boats and in fact does. Therefore, the tide-waters in the instant case are

classified as navigable waters under the definition of the 1902 Act. The 1902 Act contemplates only two categories, non-navigable and navigable tide-waters.

Having determined that the tide-waters in the instant case are navigable, what did the 1902 Act provide? Section 1 of the 1902 Act need not be considered here because it deals with landowners adjacent to *non-navigable* tide-waters. Section 3 of the Act deals with landowners adjacent to *navigable* tide-waters. (Code § 85-1309).

It provides, "For all purposes, including among others the exclusive right to the oysters and clams (but not to include other fish) therein or thereon being, the boundaries and rights of owners of land adjacent to or covered in whole or in part by navigable tidewaters, as defined in the preceding section, [definition of navigable tide-waters] shall extend to the low-water mark in the bed of the water: Provided, however, . . ."

Section 3 does not give the adjacent landowner title to anything. It grants "rights" and nothing more. The "rights" granted are similar rights this court said an adjacent landowner acquired in navigable fresh water streams under Code § 85-1303. In *Johnson* this court said the right acquired was "the right to the river-bottoms upon their lands for agricultural purposes." Using similar language in section 3 of the 1902 Act, the legislature granted landowners adjacent to navigable tide waters certain rights. Paraphrasing *Johnson,* we think it reasonable to suppose that the intention of the lawmaking power was to insure to riparian owners the right to the tide-waters for all purposes relating to the planting and cultivation of oysters and clams, and an exclusive right to harvest those crops as well as oysters and clams growing there naturally.

We note further that the Code of 1933 which has been enacted into law inserted the following caption to Section 3 of the 1902 Act; *"Rights* of owners of land adjacent to navigable tide-waters." Apparently both the codifiers and the legislature interpreted this section as dealing only with "rights."

We are not concerned here with Section 1 of the 1902 Act (Code § 85-1307). That section deals with *title* to the

*beds* of *non-navigable* tide-waters. The instant case is concerned with *rights* in *navigable* tide-waters provided for in Section 3 of the 1902 Act. Section 1 of the 1902 Act has a bearing on the instant case only because it speaks of "title to the beds." Whether this relates to the oyster beds, bottoms, or land is not decided here. What is important is that some sort of title is dealt with. In Section 3 of the 1902 Act, which governs the instant case, no mention is made of any sort of title. Section 3 only refers to *rights*. Obviously the legislature in Section 3 was granting something less than title. In our opinion nothing but the right to plant, cultivate and harvest oysters and clams was granted. Such a grant solved the problem of the oystermen. They had the exclusive right to the oysters in the tidal waters next to their adjacent land. In our opinion it is a privilege or a license. See Acts 1968, p. 202 (Code Ann. § 45-905.1) et seq. providing a uniform law relating to the zoning of tidal waters and the taking of seafood therefrom.

This conclusion comports with the general principle that a public grant is construed strictly against the grantee and nothing is taken by implication. *McLeod v. Burroughs,* 9 Ga. 213, 221 (3) (1851); *McLeod v. Savannah, A. & G. R. Co.,* 25 Ga. 445, 457 (1858).

The extension of boundaries referred to in Section 3 (Code § 85-1309) does no more than establish the extent of the rights. It conveys no title to the underlying land. See *Johnson & Co. v. Arnold,* 91 Ga. 659, 668 (18 SE 370) (1893).

We note that the rights granted by Section 3 of the 1902 Act are subject to certain provisions contained therein such as the reservation of other fish and the rights of public passage.

In our opinion the state has fee simple title to the foreshore in all navigable tide-waters.

Division 2 of *Rauers v. Persons,* 144 Ga. 23 (86 SE 244) (1915) cannot be accepted as an authoritative construction of the 1902 Act. A review of the record in that case shows that the application of the 1902 Act in Division 2 was not challenged, was not considered by the trial court, and actually was not in issue in the case. Division 2 appears to be an aberration because the trial court's denial of an injunction was affirmed despite the holding in Division 2 that an injunction should have been granted.

Division 2 is dicta, is unsound, and will not be followed.

IV

Accreted Land

(The "dry sand" area)

"According to the better authorities, the bounding of a tract by the edge or margin of a road will pass the fee to the middle line of the road when the vendor owns the fee on both sides. Upon the like reason, if he owns the fee on one side only, and the whole road is upon the margin of his tract, the proprietor on the opposite side not having any interest in its ownership, a conveyance of the tract as bounded by the margin of the road should, and we think would, pass the fee in the whole road." *Johnson & Co. v. Arnold,* 91 Ga. 659, 667 (18 SE 370) (1893). Gradual accretions of land from navigable tide-waters accrue to the adjacent land owner. Therefore, the accreted land in dispute here accrued to the owners of the lots in the East End Subdivision bounded on the east by Beach Drive. Jones v. Turlington, 243 N. C. 681 (92 SE2d 75) (1956). There are issues of fact remaining to be resolved by the trial court as to whether the accreted land has been dedicated to public use or become subject to prescriptive rights.

*Judgment reversed. Undercofler, P. J., Jordan, Ingram and Hall, JJ., and Judge Robert E. Coker concur. Nichols, C. J. and Gunter, J., dissent. Hill, J., disqualified.*

ARGUED SEPTEMBER 9, 1975 — DECIDED FEBRUARY 24, 1976 — REHEARING DENIED MARCH 11, 1976.

*Arthur K. Bolton, Attorney General, Robert S. Stubbs, II, Chief Deputy Attorney General, Don A. Langham, Deputy Attorney General, Robert S. Bomar, Senior Assistant Attorney General, Patricia T. Barmeyer, Assistant Attorney General, William H. Agnor, Deputy Assistant Attorney General,* for State of Georgia.

*Troutman, Sanders, Lockerman & Ashmore, Carl E. Sanders, John J. Dalton, June Ann McClure,* for Ashmore et al.

*Moreton Rolleston, Jr.,* for Lines et al.

*Lissner & Killian, J. J. Lissner, Jr., Charles L.*

*Gowen, A. Paul Cadenhead, David G. Crockett, James A. Mackay,* amicus curiae.

NICHOLS, Chief Justice, dissenting.

While I concur in Division 1 of the majority opinion and the ultimate conclusion reached in Division 2 that "whatever rights the individual parties to this case may have in the foreshore must be determined under the 1902 Act," I must dissent from the holding in Division 3 that such Act did not grant title to the foreshore.

In *Henderson v. Alexander,* 2 Ga. 81, 85 (1847), it was said that the court, in construing statutes, would take its guide from the following rules:

"*First.* Statutes that are remedial, are to receive an equitable interpretation, by which the letter of the Act is sometimes restrained and sometimes enlarged, so as more effectually to meet the beneficial end in view, and prevent a failure of the remedy. They are to be construed liberally and *ultra,* but not *contra* to the strict letter. 1 Kent, 464; Dwarris on Stat. 726.

"*Second.* It is the duty of Judges so to construe remedial statutes as to repress the mischief and advance the remedy. 11 Coke, 71 b; 1 Kent, 464; and in the application of this rule they are to consider the law as it stood before the act—the mischief against which it did not provide—the remedy which the Legislature has provided and the reason of the remedy.

"*Third.* The intention of the Legislature is to be deduced from a view of the whole and every part of a statute, taken and compared together. Coke Litt. 381 a; 12 Wheat. R. 332.

"*Fourth.* The real intention of the Legislature when accurately ascertained will always prevail over the literal sense of terms. 1 Kent, 461; 15 Johns. R. 380; 14 Mass. R. 92.

"*Fifth.* Several acts in pari materia and relating to the same subject are to taken together and compared in the construction of them, even though some of the statutes have expired, or are not referred to in other Acts. 1 Burrow R. 445; Doug. R. 27; 4 T. R. 447 a 450; Dwarris on Stat.. 699."

"[I]t is the duty of the courts in the construction of

statutes to give effect to the intention of the legislature when it is ascertainable (*Thompson v. Eastern Air Lines,* 200 Ga. 216, 222 (39 SE2d 225)); and in construing laws, whether statutory or constitutional, proper regard should be given to the old law, the evil, and the remedy. *Walsh v. City Council of Augusta,* 67 Ga. 293 (1a); *Demere v. Germania Bank,* 116 Ga. 317, 318 (42 SE 488); *Georgia Railroad & Bkg. Co. v. Wright,* 124 Ga. 596, 626 (53 SE 251)." *Moore v. Baldwin County,* 209 Ga. 541, 545 (74 SE2d 449) (1953).

With these rules in mind, it is necessary to look at the decision of this court in *Johnson v. State,* 114 Ga. 790 (40 SE 807) (1902). The first headnote in this decision reads: "1. In the absence of special title by grant, lease, prescription, or otherwise, the *boundary of a landowner* abutting on the ocean, or on any estuary, bay, inlet, or arm thereof where the tide regularly ebbs and flows, extends only to ordinary highwater mark. Sections 3059 and 3060 of the Civil Code are not applicable to such waters." (Emphasis supplied.) On p. 791 of this opinion it is said: "At common law, in the absence of any special title by grant or prescription, the *boundary of landowners abutting on the sea,* or upon any estuary, tidal stream, or arm of the seas where there was a regular rise and fall of the tide, extended only to high-water mark. The soil between high-water mark and low-water mark was the property of the crown. This rule, so far as the boundary of the abutting landowner is concerned, has been almost universally followed in the United States. See 4 Am. & Eng. Enc. L. (2d ed.) 818-820, and cases cited; Tyler, Boundaries, 31 et seq." (Emphasis supplied.)

This same year the General Assembly adopted the Act to be construed. This Act reads as follows in its entirety:

"An Act to fix and prescribe the boundaries of land adjacent to or covered by or bordering on the tide-waters of this State, and to prescribe all rights of the owners of such adjacent lands within such boundaries, and to define navigable tide-waters, and for other purposes.

"Be it enacted by the General Assembly of the State of Georgia, and it is hereby enacted by authority of the same.

"Section 1. That from and after the passage of this Act the title to the beds of all tide-waters in this State, where the tide regularly ebbs and flows, and which are not navigable under section 2 of this Act, shall vest in the present owner of the adjacent land for all purposes, including among others, the exclusive right to oysters, clams and other shell fish therein or thereon. If the water is the dividing line, each owner's boundary shall extend to the main thread or channel of the water. If the main thread, or center, or channel of the water changes gradually, the line follows the same, according to the change. If for any cause it takes a new channel, the original line, if capable of identification, remains the boundary. Gradual accretions of land on either side accrue to the owner.

"Section 2. Be it further enacted by the authority aforesaid, That a navigable tide-water, in contemplation of this Act, is any tide-water, the sea, or any inlet thereof, or other bed of water where the tide regularly ebbs and flows, which is in fact used for the purposes of navigation, or is capable of bearing upon its bosom at mean low tide boats loaded with freight in the regular course of trade. The mere rafting of timber thereon, or the passage of small boats thereover, whether for the transportation of persons or freight, shall not be deemed navigation within the meaning of this Act, and does not make tide-water navigable.

"Section 3. Be it further enacted by the authority aforesaid, That for all purposes, including among others the exclusive right to the oysters and clams (but not to include other fish) therein or thereon being, the boundaries and rights of owners of land adjacent to or covered in whole or in part by navigable tide-waters, as defined in section 2 of this Act, shall extend to low-water mark in the bed of the water; provided, however, that nothing in this Act contained shall be so construed as to authorize such an exclusive appropriation of any tide-water, navigable or unnavigable, by any person whomsoever, as to prevent the free use of the same by others for purposes of passage and for the transportation of such freights as may be capable of being carried thereover.

"Section 4. Be it further enacted by the authority aforesaid, That all laws and parts of laws in conflict with this Act be, and the same are, hereby repealed.

"Approved December 16, 1902." Ga. L. 1902, p. 108 (Code Ann. §§ 85-1307, 85-1308 and 85-1309).

In *Johnson v. State,* supra, it was specifically held that those sections of the Code now codified as §§ 85-1303 and 85-1304 were not applicable to land abutting tidal waters.

The General Assembly then enacted the Act in question. Section 2 of this Act follows almost verbatim the language of now Code § 85-1303 defining a navigable body of water.

Section 1 of this Act, after providing that title to the beds of all tidewaters in this State which are not navigable shall vest in the present owners of adjacent land for all purposes with certain exceptions, provided, with reference to gradual changes in the channel, the exact language that had been applicable prior thereto to non-navigable streams. Compare Code § 85-1302.

Section 3 of the Act then followed the language in the *Johnson* decision by providing the location of the boundary of property abutting navigable tidewaters. The *Johnson* decision places such *boundary* at the high water mark and the 1902 Act placed the *boundary* at the low water mark. Thus, it is seen that the evil sought to be remedied was the holding of this court in *Johnson v. State,* supra, and the only intent that can be gleaned from the Act of 1902 is that the General Assembly intended to extend the *boundary* of land abutting the tidal-waters of this State from the high water mark to the low water mark or to the middle of the channel in those cases where the title was not already at the low water mark or the middle of the channel.

The question of legislative intent in this case must be decided based upon legislative intent in 1902 and not legislative intent based upon the situation which exists in 1976. In 1902 the foreshore area of this State, which includes thousands upon thousands of acres of marshland, was not considered by the majority of Georgians as having any real value. Since 1902 beach property and marshlands, both of which are included in the definition

of foreshore, have become important to a majority of the citizens of Georgia. However, this is no reason to place a meaning upon an Act of the General Assembly different than that intended at the time of its adoption. Would the court declare today that landowners actually don't own the mineral rights to their property should vast deposits of oil be discovered underlying the surface of the earth in Georgia? While, in 1976, it may be incomprehensible to assume that the General Assembly intended to give to the adjoining landowners the foreshore of the Georgia coast, yet in 1902 this was not the case and, having concluded that title to such foreshore was granted by the 1902 Act and approved by the people in 1945, I conclude that the effect of the majority opinion is to take private property without the payment of just and adequate compensation as required by the Constitution when private property is taken for public purposes. See "Some Legal Problems Involved in Saving Georgia's Marshland," Ga. S. B. J., August, 1970, p. 27.

Having concluded that the title to the foreshore was not in the State, the defendants in the trial court, under the facts in this case, being successors in title to the subdivider were entitled to the accreted land. Compare *Akin v. Wallace,* 134 Ga. 873 (68 SE 937) (1910).

GUNTER, Justice, dissenting.

The land involved in these cases, asserted by the appellees to be in their ownership subject only to a very limited easement over part of it in favor of the public, is bounded on the east by the Atlantic Ocean, a navigable tidewater. The primary issue for decision is whether the eastern boundary of the land is the high-water mark or the low-water mark as those marks are established by the Atlantic Ocean. Other issues in the cases depend upon and flow from the decision rendered on this primary issue.

The court has held, as I read the majority opinion, that the boundary of land bordering the Atlantic Ocean is the high-water mark, and that the owner of land bounded by the high-water mark has certain limited rights, as conferred by the 1902 Act, in the foreshore area adjacent to his land. The majority holds that the State still owns the foreshore, that area between the high-water mark and

the low-water mark, subject only to the limited rights of the landowner whose property is actually bounded by the high-water mark.

This court had held, prior to the enactment of the 1902 Act, that if a landowner's property was bounded by the Atlantic Ocean, the actual boundary line of his property was the high-water mark. *Johnson v. State,* 114 Ga. 790 (40 SE 807) (1902). I can only read the 1902 Act to mean that the General Assembly overruled this court's decision in *Johnson v. State,* supra, by establishing the boundary of land adjacent to the Atlantic Ocean at the low-water mark rather than the high-water mark as this court had ruled. The low-water mark boundary was established by the General Assembly subject to the proviso contained in section 3 of the 1902 Act. The proviso reads: " . . . provided, however, that nothing in this Act contained shall be so construed as to authorize such an exclusive appropriation of any tidewater, navigable or unnavigable, by any person whomsoever, as to prevent the free use of the same by others for purposes of passage and for the transportation of such freights as may be capable of being carried thereover."

It is therefore my view that since the effective date of the 1902 Act, the eastern boundary of land adjacent to the Atlantic Ocean has been the low-water mark. However, the extension of such boundary from the high-water mark to the low water mark by the General Assembly was specifically subject to an easement in favor of the general public to use the foreshore, the area between high-water mark and low-water mark, for the purposes of fishing, passage, and transportation. But I do not agree with the narrow, limited interpretation of "fishing, passage, and transportation" urged upon the court in this case by the appellees.

The appellees concede that they do not have absolute title to the foreshore by virtue of the 1902 Act, but they contend that the only rights that the people had and have in the foreshore after the 1902 enactment were and are the "limited rights of navigation and fishing in the waters covering the foreshore." They equate the reservation contained in the proviso of the 1902 Act with the "public trust" concept derived from the Common Law. They

argue, citing cases from other jurisdictions, that the only rights reserved to the public under the Common Law trust doctrine are rights in the waters when such waters cover the foreshore, and that there are no public rights in the foreshore when the waters have receded to the low-water mark. They argue in their brief: When waters are at the low-water mark, the public has the privilege of using the water up to that line; when the water is at the high-water mark, the rights of the public are extended accordingly ... The rights specifically reserved in the 1902 Act were those of fishing, of 'passage,' and of use 'for the transportation of such freight as may be capable of being carried thereover.' The rights of passage and transportation of freight correspond directly with the Common Law rights of navigation and commerce. The rights reserved are those basic rights recognized under the common law trust doctrine. There is no justification for an interpretation of the terms of the 1902 Act which would extend the public rights beyond those embraced in the common law trust. Thus, while the public has the right to use the water covering the foreshore for the purposes of passage, transportation of goods, and fishing, there is no basis for the recognition of any other right in this area.

I reject this argument by the appellees. I do not equate the reservation of rights to the people contained in the 1902 Act with the reservation of rights apparently recognized in some jurisdictions under the Common Law trust doctrine. The 1902 Act, as I construe it, extended the boundary of land abutting the Atlantic Ocean from high-water mark to low-water mark, but it also reserved to the people certain rights in the land comprising the foreshore, those rights being passage, fishing, and transportation. The rights reserved to the people by the 1902 Act were not mere rights in the waters which cover the foreshore at high tide and then recede from the foreshore to the low water mark at low tide.

I conclude that the terms of the proviso in Section 3 reserved to the people, and to the State as representative of the people, an easement in and upon the foreshore for: (a) passage by boat, vehicle, or afoot, and (b) transportation by boat, vehicle, or other appropriate means. It is also clear to me from Section 3 of the Act that

fishing, except for oysters and clams, by the people on the foreshore was not proscribed. In other words, the right of the people to fish on the foreshore from boats, from docks, or afoot was reserved.

I would therefore hold that the boundary of property abutting the Atlantic Ocean is the low-water mark, but that the area between the high-water mark and the low-water mark, the foreshore, is impressed with an easement in favor of the public for fishing, passage, and transportation, as herein defined.

## I
## The State's Appeal

The trial court dismissed the State's complaint for failure to state a claim. I think this ruling was erroneous. The State, as representative of the people, has standing to bring a complaint for a judicial determination of public rights in land. The appellees and their predecessors, the original defendants, were asserting ownership rights that the State contended were adverse to the rights of the public in the land in question. Therefore, I think the complaint stated a claim, and it should not have been dismissed.

The trial court also granted summary judgment in favor of the appellees and against the State. I think this ruling was also erroneous. I interpret the trial court's judgment as foreclosing and denying certain rights of the people, as asserted by the State, in the foreshore area involved in this litigation. As I have stated hereinbefore, I think the rights reserved to the people in the foreshore cannot be abridged or denied by the appellees. To the extent that the trial court's judgment held otherwise, I would reverse that judgment.

I do not think that the people, and the State as representative of the people, have any property rights in accreted land above the high-water mark, land that is located outside the confines of the foreshore, unless such rights have been acquired by conveyance or prescriptive use. I would reject the State's arguments based on dedication and custom.

## II
## The Appeal by Lines et al.

The trial court granted summary judgment in favor

of the appellees against these appellants. I think this ruling was erroneous. These appellants, like the people in general, have rights in the foreshore that cannot be abridged or denied by the appellees. Therefore, the judgment below, to the extent that it denied these appellants the right that the public has in the foreshore, should, in my opinion, be reversed.

The rights that these appellants may have or may not have in the accreted land above the high-water mark and outside the confines of the foreshore poses a different problem. These appellants purchased their subdivision lots pursuant to a plat that showed Beach Drive as the eastern boundary of the subdivision. The eastern boundary of Beach Drive was, at that time, the high-water mark and the landward boundary of the foreshore. Since 1911, when the subdivision plat was prepared, the foreshore has moved seaward and accreted land now exists between the eastern boundary of Beach Drive and the present high-water mark. In other words, this accreted land now lies between Beach Drive and the foreshore. The 1911 plat designated the area east of Beach Drive, at that time the foreshore, as "Beach." It is thus seen that the original subdivision owners, and the appellees here are their successors in title, had ownership rights in the foreshore after the passage of the 1902 Act. The land between Beach Drive and the present foreshore is therefore owned by the appellees unless the original subdivision owners, by conveying subdivision lots pursuant to the prepared plat, granted an easement to the purchasers of lots in the subdivision that would permit such purchasers to use the area east of Beach Drive. I conclude that the public has no rights in this accreted land, and such rights as the purchasers of lots may have is solely by virtue of their being purchasers of land pursuant to a subdivision plat. The appellees acquired their ownership rights in the accreted land from the original subdivision owners. Likewise, the appellants, owners of lots in the subdivision, derive their easement rights, if any, in the accreted land from the original subdivision owners. The contesting parties are therefore asserting rights in the accreted land that have come down to them from a common source of title. I think that this issue

between subdivision lot owners and the appellees must yet be determined in the trial court.

Beach Drive has never been opened and maintained as a street. Glynn County does not claim any rights in it. I think that the owners of subdivision lots that abut on the west side of Beach Drive now own the western one-half of Beach Drive. The appellees, whose predecessors in title retained ownership rights in the area east of Beach Drive, now own the eastern one-half of Beach Drive where it abuts accreted land in which they have ownership rights. I think that the appellees' ownership of such eastern one-half of Beach Drive and their ownership of the accreted land east of Beach Drive is subject to any easement thereover that subdivision lot-owners may have, an issue that should hereafter be determined in the trial court.

My determination of the present ownership of Beach Drive is dictated by this court's decision in *Johnson & Co. v. Arnold,* 91 Ga. 659 (18 SE 370) (1893). The "marginal monument rule" does not, in my opinion, apply in this case, because the original subdivision developers retained ownership rights in the area east of Beach Drive, this area being the foreshore when the subdivision plat was prepared.

### III
### My Conclusions

1. The appellees' land in these cases in bounded by the Atlantic Ocean, and the seaward boundary is the low-water mark. However, appellees' land that lies within the foreshore is subject to an easement in favor of the public as delineated in this dissenting opinion.

2. The people have no rights in accreted land outside the confines of the shifting foreshore unless such public rights have been acquired by conveyance or prescriptive use.

3. The appellants who are subdivision lot owners have no ownership rights in accreted land east of Beach Drive; and such easement rights as these appellants may have, if any, in the eastern one-half of Beach Drive and the accreted land east of Beach Drive should hereafter be determined in the trial court.

I would reverse the judgment below and remand

these two cases to the trial court for further proceedings consistent with my views stated in this dissenting opinion.

I respectfully dissent.