37291. SMITH v. STATE OF GEORGIA et al.
37292. STATE OF GEORGIA et al. v. BRUCE et al.
37293. ROWLAND HILLS CORPORATION et al. v. STATE OF GEORGIA et al.

GREGORY, Justice.

This is the fourth appearance of this case in this court. See *State of Ga. v. Bruce,* 231 Ga. 783 (204 SE2d 106) (1974); *Smith v. Bruce,* 241 Ga. 133 (244 SE2d 559) (1978); *Bruce v. Rowland Hills Corp.,* 243 Ga. 278 (253 SE2d 709) (1979). The history of this land registration case is detailed in *Smith v. Bruce,* 241 Ga. 133, 147, supra. The controversy concerns approximately 26 acres of the beach area of St. Simons Island. In *Smith v. Bruce* we stated: "Some [appellants] offered evidence to show that all easements to the land had been lost by avulsion. The examiner did not agree that the evidence offered was sufficient to show the land area had been lost and [appellants] excepted to this finding. This issue of fact must also be tried by a jury. If a jury should find that the land in question has been lost through erosion or avulsion and the east half of Beach Drive (Dixon Drive) was likewise lost so that the mean high water mark had at one time moved inland beyond the west margin of said drive, then upon the land accreting again, each lot owner abutting the west side of said drive, and so affected, would gain title to the accreted land lying between the north and south parallel lines of their respective lots if extended easterly across Beach Drive (Dixon Drive) to the present mean high water mark. This is in keeping with our holding in *State of Ga. v. Ashmore* [236 Ga. 401 (224 SE2d 334) (1976)]. The facts as respects each lot could vary with resulting different jury verdicts."

On remand the trial court charged the jury that in determining whether the "mean high water mark" had advanced so that the easements in question had been lost by erosion or avulsion, they were to consider that the mean high water line indicates that "approximately half the time the tides rose above this line." See, *Smith v. Bruce,* supra, at 140. The jury returned answers to thirty-one special interrogatories, finding as to each lot in question that the "average high water line of the Atlantic Ocean" had not advanced to the eastern edge of Beach Drive, the center line of Beach Drive, the western edge of Beach Drive or beyond the western edge of Beach Drive. The trial court then entered a judgment that none of the easements to the hard beach had been lost by erosion.

(1) (a) Appellants Smith and Rowland Hills Corporation enumerate as error the trial court's failure to grant their motions for directed verdict on the issue of erosion. They also argue that the trial court erred in failing to define "mean high water mark" to the jury.

Appellant Smith contends that the trial court erred in failing to charge the definition given to this phrase by the United States Supreme Court in Borax Consolidated Ltd. v. Los Angeles, 296 U. S. 10 (56 SC 23, 80 LE 9) (1935). Appellant Rowland Hills argues that the Borax decision is inapplicable to this case, but contends that the trial court erred in failing to give their numerous requests to charge on the definition of "mean high water mark."

At trial appellants offered testimony of several East Beach lot owners to show that the ocean had, at varying times over the years, washed beyond the western edge of Beach Drive and even onto some of the East Beach lots. Appellants contend this evidence shows that, as a matter of law, the easements in the hard beach were lost by erosion. Thus, appellants claim title to the more than 26 acres of land which has accreted since the "mean high water mark" allegedly advanced beyond the western boundary of Beach Drive.

In Borax Consolidated, supra, the Supreme Court adopted the definition of "mean high tide" given by the U. S. Coast and Geodetic Survey as the standard for determining tidal boundaries of land received under a federal grant. Noting that the range of the tide at any given point may vary daily, the Court found that "mean high water at any place is the average height of all the high waters at that place over a considerable period of time [which] from theoretical considerations of an astronomical character . . . should be a . . . period of 18.6 years." Borax at 26-27.

It is significant to note at the outset of this discussion that "in tide terminology the words 'water' and 'tide' are synonymous. High tide and high water, mean high tide, and mean high water, etc. have exactly the same technical meaning."[1]

The United States Coast and Geodetic Survey bears the primary responsibility for measuring tides in this country. It maintains tide-measuring stations all along the United States coastlines and "publishes tide tables for the entire world which predict, more than a year in advance of publication, both the time and height of high and low tides."[2] Generally "a mechanical recording instrument is used which continuously traces on paper the height of the water at any instant." If properly installed, these automatic tide gauges are extremely accurate.[3]

"The variations in the major tide-producing forces are a result of changes in the moon's phases, declination to the earth, distance from

---

[1] "The Luttes Case — Locating the Boundary of the Seashore," 12 Baylor L. Review 141, 151 (1960).

[2] Id. at 144.

[3] Id. at 145.

the earth and regression of the moon's nodes. The variations which occur because of this latter factor will go through one complete cycle in approximately 18.6 years. The other changes have cycles varying from 27 1/3 days (moon's declination) to 27 1/2 days (moon's distance) to 29 1/2 days (moon's phases). These cycles differ in magnitude, and their effect on the tide varies from place to place around the earth. The various combinations of all these changes also result in the daily variations in the tide at a given location. . . . Because the magnitude of the rise and fall of the tide varies from day to day, tidal characteristics derived from daily observations may differ considerably from the average or mean values over a long period of time. Therefore, the average must be based on long-term observations before it can be considered an accurate value for the tidal datum."[4]

"Twice a month, when the astronomic forces are working in conjunction with each other, the maximum range, or spring tides, occur; the high tide is higher than average and the low tide is lower . . . [t]wice a month the minimum range or neap tides, occur, because the astronomic forces are working in opposition to each other; the high tide is lower than the average, and the low tide is higher."[5] See *Borax*, supra, at 23. The U. S. Coast and Geodetic Survey averages all of the high tides, including the spring and neap tides, to determine the mean high tide or water. Under this determination "[t]he mean high water at any place is the elevation of the mean level of high water determined, either directly or indirectly, by averaging the height of *all* the high waters at that place over a period of 19 years."[6] (Emphasis supplied.) The U. S. Coast and Geodetic Survey calculates the 18.6 year cycle "as a 19 year cycle as a matter of practicality and convenience."[7] Thus, the mean high tide or water at any point along the coast is the mean of all the high tides at that point during a 19-year period. The U. S. Coast and Geodetic publications, reflecting the computations of the mean high tides, are heavily relied on by surveyors in determining tidal boundaries.[8] As noted in one U. S. Coast and Geodetic Survey publication, "[b]oundaries determined by the course of the tides involve two engineering aspects: a vertical one, predicated on the height reached by the tide during its vertical rise and fall, and constituting a tidal plane or datum . . . and a

---

[4] "The Use and Legal Significance of the Mean High Water Line in Coastal Boundary Mapping," 53 N.C. L. Review, 186-273, 196-197 (1974).

[5] "Fluctuating Shorelines and Tidal Boundaries: An Unresolved Problem," 6 San Diego L. Review, 447, 456 (1969).

[6] Id., 451, 461.

[7] 12 Baylor L. Review at 150.

[8] 6 San Diego L. Review 458.

horizontal one, related to the line where the tidal plane intersects the shore to form the tidal boundary. . . . The first is derived from tidal observations alone, and, once derived . . . is for all practical purposes a permanent one. The second is dependent on the first, but is also affected by the natural processes of erosion and accretion, and the artificial changes made by man."[9] As noted by the Supreme Court in Borax, supra, the point of intersection is *not* "a physical mark made upon the ground by the waters." Borax at 22. As the waves break against the shore, water generally rolls to a higher point than the point reached by the wave; gusty winds may push the water even further upland. However, "water pushed or rolled onto the upland in this manner is not considered [by the U. S. Coast and Geodetic Survey] in measuring the height of the tide and will not be reflected by the tide gauge."[10] Other courts have noted that in determining the mean high tide or water mark, "[no] consideration whatever is given to the wash of the waves or the reach or the run of the sea water upon the coast. Such movements of the sea are not considered in determining the height of the tide. . . . Nor does the run, roll, or reach of the waves constitute the measure of the rise of the tide. Likewise, tide-water is confined to the level of the rise of the tide, and not to the run or reach of the waters caused by the waves or the swell of the ocean." Bolsa Land Co. v. Vaqueros Major Oil Co., 25 Cal. App. 2d 75 (76 P2d 519, 522) (1938).[11]

We adopt the definition of mean high tide or water given by the U. S. Coast and Geodetic Survey and hold that the mean high water at any given point along the coast is the elevation of the mean level of high water calculated by averaging the height of *all* the high waters at that place over a period of 19 years. We further hold that the mean high water *mark* is to be determined by projecting the tidal plane of the mean high water to the point of its intersection with the shore.

(b) The evidence to be submitted to a jury when exceptions are made to the examiner's findings under Code Ann. § 60-304 shall "include only the evidence reported by the examiner; evidence, if any, which was improperly excluded by the examiner or not reported; and any newly discovered evidence. . . ." *Bruce v. Rowland Hills Corp.,* 243 Ga. 278, 279 (253 SE2d 709) (1979); Code Ann. § 60-304. It is not

---

[9] 6 San Diego L. Review at 450, citing, A. Shalowitz, *Shore and Sea Boundaries,* 89 (Coast and Geodetic Survey Pub. No. 10-1, 1962).

[10] 12 Baylor L. Review at 147.

[11] For other cases which have rejected the notion that the wash of the waves marks the highest point reached by the tide see, Eichelberger v. Mills Land & Water Co., 9 Cal. App. 628 (100 P 117) (1909); and Faulks v. Borough of Allenhurst, 115 NJL 456 (180 A 887) (1935).

disputed that appellants offered no evidence to show that the mean high water mark advanced over the western edge of Beach Drive, save testimony concerning the wash of the waves on the shore. Appellants have not complained that any evidence offered to prove the high water mark, as defined above, was improperly excluded by the examiner; nor can we say that such evidence would be "newly discovered" within the meaning of the statute as it is readily available from the U. S. Coast and Geodetic Survey. Having failed to offer any evidence to meet the Borax test, appellants were not entitled to a charge under Borax. Therefore, the trial court did not err in refusing to charge the Borax rule. Even if we were to order a new trial on this issue, as a matter of law, appellants would be unable to prove, under the evidence presented, that the "mean high water mark" advanced beyond the western edge of Beach Drive.

Given our holding in this division, we find appellant Smith's and appellant Rowland Hills' other enumerations of error to be without merit.

(2) At trial the State and Glynn County stipulated that if the jury found that the easements in question had been lost by erosion, the State and County would not claim that the accreted land had been impliedly dedicated to the public. The trial court did not instruct the jury to determine whether the land had been finally dedicated to the public should they answer all the special interrogatories in the negative. Once the jury returned the special interrogatories, the trial court, apparently relying on our decision in *Lines v. State of Ga.,* 245 Ga. 390 (264 SE2d 891) (1980), directed the jury to return a verdict that "the offer of dedication, if any . . . was not accepted by the public, the State of Georgia or by Glynn County."

The State and Glynn County appeal the grant of the motions for directed verdict. The State alleges that the trial court erred in concluding that, as a matter of law, there had not been an acceptance of the offer of dedication by either the county or the general public. We agree and reverse.

Code Ann. § 81A-150 provides, in part: "if there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict, such verdict shall be directed."

To prove a dedication of land to public use, there must be an offer, either express or implied, by the owner of the land, and an acceptance, either express or implied, by the appropriate public authorities or by the general public. *Ross v. Hall County Commrs.,* 235 Ga. 309 (219 SE2d 380) (1975); *Carroll v. DeKalb County,* 216 Ga. 663 (119 SE2d 258) (1961); *Brown v. City of East Point,* 148 Ga. 85 (95

SE 962) (1918).

Code Ann. § 85-410 provides: "if the owner of lands, either expressly or by his acts, shall dedicate the same to public use, and the same shall be so used for such a length of time that the public accommodation or private rights might be materially affected by an interruption of the enjoyment, he may not afterwards appropriate it to private purposes."

" 'Where the owner of a tract of land subdivides it into lots and records a map or plat showing such lots, with designated streets, and sells lots with reference to such map or plat, the owner will be presumed to have *expressly dedicated* the streets designated on the map to the public.' " (Emphasis supplied.) *Ross v. Hall County,* supra, at 311; *Young v. Sweetbriar, Inc.,* 222 Ga. 262 (149 SE2d 474) (1966); *Carroll v. DeKalb County,* supra.

Relying on these propositions of law, we held in *Smith v. Bruce,* supra, at 141-143, that the recording of the 1914 J. B. High Subdivision plat and the sale of lots in the East Beach Subdivision with reference to the High plat by the Bruces completed the offer of dedication to the public, not only of the streets and alleys of the subdivision, but also of "the beach area, including the hard beach as far as legally possible, and the area of the soft beach between the mean high water line and the street designated as Beach Drive." Under the authorities, this offer of dedication was express.

We further concluded in that case that "[a]ssuming the land area involved has not been heretofore destroyed through erosion by the westward migration of the ocean, we cannot say as a matter of law from the evidence introduced that the disputed area [offered] has been accepted by the public and, therefore, finally dedicated as a public beach or recreational area. The findings of fact [by the examiner] excepted to in this regard must be determined by a jury under the provisions of the Land Registration Law, Code Ann. § 60-304." *Smith v. Bruce,* supra, at 146.

The State concedes that there has not been an express acceptance of the Bruces' offer of dedication by any public authority. Rather, the State's position is that certain acts taken by the county in conjunction with acts taken by the general public amount to an *implied* acceptance of the offer of dedication.

The Georgia cases recognizing an implied acceptance by the general public of an express offer of dedication fall primarily into three categories: dedications of cemeteries, streets and parks. These cases uniformly indicate that acceptance by the public for public use is sufficient to complete the dedication without acceptance by the appropriate public authorities. See, *Chatham Motorcycle Club v. Blount,* 214 Ga. 770 (107 SE2d 806) (1959) (express offer of

dedication of a street); *City of Abbeville v. Jay*, 205 Ga. 743 (55 SE2d 129) (1949) (express offer of dedication of a park); *Haslerig v. Watson*, 205 Ga. 668 (54 SE2d 413) (1949) (express offer of dedication of a cemetery).

The majority rule appears to be that the acceptance of an express offer to dedicate property may be shown by public use of the property for a period of time sufficient to indicate that the public is acting on the basis of a claimed right resulting from the dedicatory acts by the owner. 11 McQuillin 760, Municipal Corporations, Dedication, § 33.50; 26 CJS Dedication, § 37. "Acceptance by the public need not be immediate, but may be made when public necessity or convenience arises. As a corollary to this proposition, it follows that it is not necessary that the public use the entire property dedicated. Any public use of a part of the property, indicating a purpose to accept the gift, fixes the public right to the whole." *East Atlanta Land Co. v. Mower*, 138 Ga. 380, 391 (75 SE 418) (1912). The length of time of public use is not as significant as the character of the use in determining whether the public has accepted the offer of dedication. "[E]ach situation must be judged in relation to its own surroundings and conditions, and with regard for the number of persons who would have occasion to use the [land]." 11 McQuillin 761, supra, Dedication, § 33.50.

The Georgia cases have not required that the public use the land for any specific period of time in order to impliedly accept the offer of dedication; rather the cases have indicated that the use must simply be over a period of time long enough to indicate an intent or purpose to accept the offer. *East Atlanta Land Co.*, supra; *Haslerig v. Watson*, supra. Once it is shown that public use has been made of the land "for such a length of time that the public accommodation and private rights might be materially affected by the interruption of the enjoyment, the dedication is complete." *Savannah Beach, Tybee Island v. Drane*, 205 Ga. 14 (52 SE2d 439) (1949); Code Ann. § 85-410.

The length of time of public use becomes critical only when its proof is necessary in order to establish the owner's dedicatory intent, as in the case of proving an implied dedication. See *Lines v. State of Ga.*, 245 Ga. 390, supra; *Healey v. City of Atlanta*, 125 Ga. 736 (54 SE 749) (1906); 11 McQuillin, supra, Dedication, § 33.50; 26 CJS, Dedication, § 37. This is also the rule in other jurisdictions. See, e.g., Bartlett v. Stalker Lake Sportsmen's Club, 168 NW2d 356 (Sup. Ct. Minn. 1969); Hoechst v. Bangert, 440 SW2d 476 (Sup. Ct. Mo. 1969).

In Bartlett, supra, the Supreme Court of Minnesota found that the use of a bog by six duckhunters during one duckhunting season was sufficient to constitute acceptance of an express offer of

dedication of an easement in the bog. In so concluding, the court stated: " 'The use by the public is sufficient if those members of the public — even though they be limited in number and even if some are accommodated more than others — who would naturally be expected to enjoy [the land] do, or have done so, at their pleasure and convenience.' Further, the sufficiency of the public user depends on the character and extent of the use as well as the nature of the surrounding area and may be of short or long duration." 168 NW2d at 359.

Proof that a public authority has impliedly accepted an offer of dedication may be made by showing that the authority has exercised control over the property, made improvements or maintained its upkeep. See *Ross v. Hall County Commrs.,* 235 Ga. 309 (219 SE2d 380) (1975); *Lowry v. Rosenfeld,* 213 Ga. 60 (96 SE2d 581) (1959); *Hames v. City of Marietta,* 212 Ga. 331 (92 SE2d 534) (1956).

In the case before us the State offered evidence to show that Glynn County has sporadically stationed lifeguards on the disputed stretch of beach since the 1950's, although no lifeguard has been stationed there at county expense since 1974; that the County has placed between four and eight trash receptacles on the disputed beach which it regularly empties; and that the County has, from time to time, placed signs on the beach warning swimmers of hazardous conditions. The State also introduced testimony from two non-residents of the island who stated that they had used the beach in question "as members of the general public" since 1914. There was also testimony to show that the Girl Scouts and a local religious organization had regularly used the beach for outings.

We are aware of no Georgia authority, and the parties have cited none to us, which recognizes the sufficiency of public user necessary to accept an express offer of dedication of beach property.

Other jurisdictions, however, have dealt with this problem. See Phillips v. Laguna Beach Co., 211 P. 225 (Sup. Ct. Cal. 1922); Greenco Corp. v. City of Virginia Beach, 214 Va. 201 (198 SE2d 496) (1973); Gewirtz v. City of Long Beach, 330 NYS2d 495 (Sup. Ct. NY 1972). In each of these cases an express offer of dedication of beach property was made and an implied acceptance of the offer was found to have been made by the public. The evidence of public use in each case varied from simply walking, camping and picnicking on the beach to forming a civic association for the upkeep and protection of the disputed property. In each case the courts recognized that, while the public did not, due to the nature of the land itself, constantly make use of the beach, the uses made were consistent with the character of the land and, thus, were sufficient to constitute an acceptance.

As we stated in *Smith v. Bruce,* supra, we cannot say, as a matter

of law, that the evidence introduced by the State amounts to an acceptance of the offer of dedication. However, neither can we say that, as a matter of law, this evidence, with all the reasonable deductions that may be drawn from it, demands a verdict that the public did not accept the offer of dedication. Therefore, we conclude that the trial court erred in finding that, as a matter of law, no acceptance of the offer of dedication had been made and in directing a verdict against the State.

The record indicates that the trial court, in directing the verdict, relied on *Lines v. State of Ga.,* 245 Ga. 390, supra, as controlling authority. However, that case dealt with the sufficiency of evidence of public use necessary to establish dedicatory intent where the State relied on an *implied offer* of dedication, not with the sufficiency of public use necessary to prove an implied *acceptance* of an *express* offer of dedication. There we noted that where the theory that the owner has *impliedly* dedicated the property is relied on, the party so contending must show more than simply that the public made uses of the beach which were consistent with the uses made by the owner. "Trespassing on lands adjacent to a public beach is so frequently engaged in by persons claiming no title or interest in the land itself, it is of little evidentiary value in proving possession, and standing alone is totally insufficient [to prove dedicatory intent]." *Lines,* at 395.

However, public uses of a beach which are insufficient to prove that the owner of the property intended to dedicate it to the public may be sufficient to constitute an implied acceptance of the property where an express offer of dedication has been made. This is a question for the trier of fact.

*Judgment affirmed in case nos. 37291 and 37293. Judgment reversed in case no. 37292. Jordan, C. J., Hill, P. J., Clarke and Smith, JJ., concur. Marshall, J., concurs in the judgment only.*

DECIDED SEPTEMBER 17, 1981.

*Moreton Rolleston, Jr.,* for appellant (case no. 37291).

*Arthur K. Bolton, Attorney General, Patricia Barmeyer, Assistant Attorney General, Liles, Dennard, Caldwell & Jordon, Thomas E. Dennard, Jr., Dickey, Whelchel, Miles & Brown, Terry L. Readdick, Reid W. Harris, B. N. Nightingale,* for appellees (case no. 37291).

*Arthur K. Bolton, Attorney General, Patricia Barmeyer, Assistant Attorney General, Terry L. Readdick,* for appellants (case no. 37292).

*Moreton Rolleston, Jr., Reid W. Harris, Thomas E. Dennard, Jr., B. N. Nightingale,* for appellees (case no. 37292).

*Reid W. Harris,* for appellants (case no. 37293).

*Arthur K. Bolton, Attorney General, Patricia Barmeyer, Assistant Attorney General, Terry L. Readdick, B. N. Nightingale, Moreton Rolleston, Jr., Thomas E. Dennard, Jr.,* for appellees (case no. 37293).